## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| MONIQUE ATTUSO, ELI DARWIN, ZACHARY ATTUSO, MARC ATTUSO, RICKY RODRIGUEZ AND REPUBLIC FIRE & CASUALTY INSURANCE COMPANY, *Plaintiff* vs. OMEGA FLEX, INC., & AUDUBON PLUMBING, INC. *Defendants.* | C.A. No.: 3:18-cv-00157-SDD-RLB |

## DEFENDANT OMEGA FLEX, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERTS

Dated: August 30, 2019

Respectfully submitted,
THE DEFENDANT
OMEGA FLEX, INC.

By: _David R. Frohn_
DAVID R. FROHN, Bar No. 5758
MG+M Law Firm
2201 Lake Street, Suite 106
Lake Charles, LA 70601
Telephone:    (337) 419-1929
Facsimile:    (337) 564-6899

BY:    */s/ Cullen W. Guilmartin*
Cullen W. Guilmartin (*Pro Hac Vice*)
Delaney M. Busch (*Pro Hac Vice*)
GORDON & REES LLP
95 Glastonbury Blvd., Ste. 206
Glastonbury, CT 06033
Tel: (860) 494-7513
Fax: (860) 560-0185
Email: cguilmartin@grsm.com
Email: dbusch@grsm.com

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND INFORMATION ...................................................................... 2

    a.    Case Overview ......................................................................................... 2

    b.    Background of CSST ................................................................................ 4

    c.    The Integrity Report ................................................................................ 6

    d.    The Integrity Experts' Testimonies ........................................................ 10

        i.    Background Regarding Integrity Experts .............................. 10

            a.    Expert Colwell ........................................................ 10

            b.    Non-Disclosed Expert Spruiell ............................... 11

            c.    Non-Disclosed Expert Geer ..................................... 12

        ii.   Testimony Regarding Susceptibility of Bonded CSST ........... 13

        iii.  Testimony Regarding Omega Flex D&&I Guide .................... 15

III.  LEGAL STANDARDS ....................................................................................... 18

    a.    Federal Rule of Civil Procedure 26 ........................................................ 18

    b.    Federal Rule of Evidence 702 ................................................................ 19

    c.    Daubert and its Progeny ......................................................................... 20

        1.    Reliability Element Under Daubert Standard ......................... 21

        2.    Relevance Element Under Daubert Standard .......................... 22

IV.   LEGAL ARGUMENT ........................................................................................ 23

    a.    Integrity Experts Cannot Render the Opinion that the Attuso Fire Would Still Have Occurred if the CSST was Bonded ...................................... 24

    b.    Mr. Colwell cannot render the opinion that certain instructions within the Omega Flex D&&I guide are confusing, as he is neither qualified, nor will it assist the trier of fact ...................................................................... 27

        1.    Mr. Colwell is not qualified to render an opinion regarding Omega Flex's instructions .................................................... 27

2.    Mr. Colwell cannot render the opinion that certain instructions within the Omega Flex D&&I guide are confusing as his opinion is not reliable nor based on reliable methodology ........................................ 30

3.    Mr. Colwell's opinion regarding Omega Flex's instructions cannot be construed as relevant or an opinion that will assist the trier of fact ............................................................................................................ 32

V.    CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

Atlantic Specialty Ins. Co. v. Porter, Inc.,
    2016 WL 6569346 (E.D. LA. Nov. 4, 2016) ........................................................................ 23

Barrett v. Atl. Richfield Co.,
    95 F.3d 375 (5th Cir.1996) ............................................................................... 21, 31

Brainard v. American Skandia Life Assur. Corp.,
    432 F.3dd 655 (6th Cir. 2005) ............................................................................... 19

Clark v. R.D. Werner Co., Inc.,
    2000 U.S. Dist. LEXIS 7574 (E.D. La. 2000) ........................................................ 28

Daubert v. Merrell Dow Pharms., Inc.,
    509 U.S. 579 (1993) ......................................... 1, 19, 20, 21, 22, 23, 24, 25, 30, 32, 34

De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.,
    2015 U.S. Dist. LEXIS 182435 (N.D. Tex. Jan. 21, 2015) ......................................... 23, 24, 32

Diggs v. Citigroup, Inc.,
    551 F. App'x 762 (5th Cir. 2014) .................................................................... 22, 23, 24

Gammill v. Jack Williams Chevrolet, Inc.,
    972 S.W.2d 713 (Tex. 1998) .................................................................................. 27

Garcia v. BRK Brands, Inc.,
    266 F. Supp.2d 566 (S.D. Tex. May 27, 2003) ................................................. 21, 22, 24, 25, 26

Gen. Elec. Co. v. Joiner,
    522 U.S. 136 (1997) ............................................................................................. 23

Gopalratnum v. Hewlett-Packard Co.,
    2017 US Dist. LEXIS 40386 (E.D. Wis. Mar. 21, 2017) ....................................... 34

Guile v. United States,
    422 F.3d 221 (5th Cir. 2005) ............................................................................. 22, 32

Hathaway v. Bazany,
    507 F.3d 312 (5th Cir. 2007) ............................................................................. 19, 21

Hilt v. F.F.C., Inc.,
    170 F.R.D. 182 (D. Kan. 1997) ............................................................................. 19

Honey-Love v. United States,
    664 Fed. Appx. 358 (5th Cir. 2016) ....................................................................... 18

In re Pool Prods. Distribution Mkt. Antitrust Litig.,
166 F. Supp. 3d 654 (E.D. La. 2016).................................................... 19, 20, 21, 22, 24, 32, 33

Johnson v. Arkema, Inc.,
685 F.3d 452 (5th Cir. 2012) ........................................................................................... 21

Knight v. Kirby Inland Marine Inc.,
482 F.3d 347 (5th Cir. 2007) ........................................................................ 20, 21, 24, 34

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999)......................................................................................................... 23

Leblanc v. Chevron USA, Inc.,
396 F. App'x 94 (5th Cir. 2010)...................................................................... 20, 23, 24, 34

McCune v. Graco Children's Prods., Inc.,
495 F. App'x 535 (5th Cir. 2012)..................................................................................... 22

Mid-State Fertilizer Co. v. Exch. Nat'l Bank,
877 F.2d 1333 (7th Cir. 1989) ......................................................................................... 19

Moore v. Ashland Chem., Inc.,
151 F.3d 269 (5th Cir. 1998) ........................................................................ 20, 21, 24, 34

Payne v. Brayton,
2017 U.S. Dist. LEXIS 6602 (E.D. Tex. Jan 18, 2017) ................................................... 18

Paz v. Brush Engineered Materials, Inc.,
555 F.3d 383 (5th Cir. 2009) ........................................................................................... 21

Pride v. BIC Corp.,
218 F.3d 566 (6th Cir. 2000) ..................................................................................... 22, 24

R.C. Olmstead, Inc. v. CU Interface, LLC,
657 F. Supp. 2d 905 (N.D. Ohio 2008),
affirmed by 606 F.3d 262 (6th Cir. 2010) .................................................................. 18, 19

Redman v. John D. Brush & Co.,
111 F.3d 1174 (4th Cir.1997) ..................................................................................... 21, 31

Runnels v. Tahsin Indus. Corp.,
2013 WL 6834632 .................................................................................................... 28, 29

Salgado v. Gen. Motors Corp.,
150 F.3d 735 (7th Cir. 1998) ........................................................................................... 19

Sittig v. Louisville Ladder Grp. LLC,
136 F. Supp. 2d 610 (W.D. La. 2001) .............................................................................. 28

Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,
    2016 U.S. Dist. LEXIS 40416 (E.D. La. Mar. 28, 2016) ....................................... 27

Tamraz v. Lincoln Elec. Co.,
    620 F.3d 665 (6th Cir. 2010) ..................................................................... 20, 33

United States v. Cooks,
    589 F.3d 173 (5th Cir. 2009) .......................................................................... 20

Watkins v. Telsmith, Inc.,
    121 F.2d 984 (5th Cir. 1980) ..................................................................... 20, 24

Wells v. Smithkline Beecham Corp.,
    601 F.3d 375 (5th Cir. 2010) ............................................................... 20, 22, 33

Wilson v. Woods,
    163 F.3d 935 (5th Cir. 1999) .......................................................................... 27

**Rules**

Fed. R. Civ. P. 26 ............................................................................... 1, 18, 34

Fed. R. Civ. P. 26(a)(2)(B)(ii) .................................................................... 18

Fed. R. Civ. P. 26(a)(2)(B)(iii) ................................................................... 18

Fed. R. Evid. 702 ............................................................ 1, 19, 20, 23, 30, 32, 34

**Other Authorities**

4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000).................................. 20, 27, 31

National Fuel Gas Code NFPA 54/ANSI Z223 ............................................................ 6

National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7, 7.3.2,
    7.13.2, passim (2012 ed) ................................................................................ 5

National Fuel Gas Code, ANSI Z223.1–2015 (NFPA 54–2015) §§ 5.6.3.4, 7.2.6, 7.3.2,
    7.13.2, passim (2015 ed.) ............................................................................... 5

## I.    **INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 26 and Federal Rule of Evidence 702, the Defendant Omega Flex, Inc. ("Omega Flex"), hereby submits this Memorandum of Law in Support of its Motion to Exclude Certain Opinions and Testimony of Plaintiff's Experts, Derek Geer ("Mr. Geer"), John Spruiell ("Mr. Spruiell"), and Kelly Colwell ("Mr. Colwell") (collectively "Integrity experts").[1]  The Integrity experts prepared a joint report outlining the opinions that they will offer at trial.  Omega Flex herein seeks to preclude the Integrity experts from offering certain opinions contained in the joint report and accompanying testimony that do not meet the requirements for expert opinion as espoused in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) and its progeny.

Specifically, the Integrity experts should be excluded from testifying regarding the following opinions included in their February 14, 2019, report (attached hereto as **Exhibit A**):

1. The fire at issue would still have occurred if the CSST was bonded; and

2. The applicable Omega Flex Design Guide and Installation Instruction ("D&I Guide") is ambiguous or confusing.

As detailed herein, the Integrity experts cannot reliably render an opinion or testimony that the subject fire would have occurred even if the CSST was bonded (i.e. that an electrical arcing event would still occur), as the Integrity experts took no steps to apply this methodology/test to this action.  Rather, the Integrity experts rely on tests that they ran, unrelated to the Attuso home, where an arc event occurred when CSST was bonded. However, those tests in no way relate to the

---

[1] Please note the Integrity experts (e.g. Mr. Colwell, Mr. Geer, and Mr. Spruiell) co-authored one report, which contains a compilation of their individual opinions.  <u>See</u> C. Colwell's Depo., dated May 14, 19, at pp. 80-81, attached hereto as **Exhibit B** (noting that not all of the opinions within the one report are his, some are the opinions of Mr. Spruiell and Mr. Geer); J. Spruiell Depo., dated May 14, 2019, at p. 11, attached hereto as **Exhibit C** (noting that he was a contributor to the written report; along with Mr. Colwell and Mr. Geer).  Sprueill and Gere were not disclosed as experts in this case.

Attuso home and were designed in such a way that an electrical arc was nearly inevitable. In this regard, their opinions are akin to an expert testifying that a seat belt would be ineffective in a 10 mile an hour crash, by relying on crash tests at 100 miles-per-hour.

Furthermore, the Integrity experts cannot render the opinion that the D&I Guide is ambiguous. As a threshold matter, the experts are simply not qualified to render this opinion. Moreover, as there is no evidence that the installer read the instructions – let alone that the installer misread the instructions as suggested by the Integrity witnesses – any opinion regarding a claimed ambiguity is of no use to the trier of fact as there are no facts or information surrounding the installation of the CSST and/or the qualifications or mindset of the installer in this case.

For these reasons, the Plaintiffs' experts should be precluded from testifying that bonding of the CSST would not have prevented the subject fire.

## II.    BACKGROUND INFORMATION

### a.    Case Overview

This matter was initiated by Republic Fire & Casualty Ins. Co., (hereinafter "Republic") along with individual Plaintiffs, Monique Attuso (hereinafter, "Ms. Attuso"), Ricky Rodriguez (hereinafter "Mr. Rodriguez"), Eli Darwin, Zachary Attuso, and Marc Attuso (collectively "Insureds," or "Individual Plaintiffs")[2] in order to recover from losses involving a January 21, 2017, house fire at Ms. Attuso's residence located in Clinton, Louisiana.[3] Compl. at ¶3. Republic alleges that Omega Flex manufactured TracPipe Corrugated Stainless Steel Tubing ("CSST" or "TracPipe") which allegedly failed as a result of a lightning strike. Republic further alleges that this failure resulted in propane gas escaping the CSST, subsequently igniting, sustaining ignition,

---

[2] The Individual Plaintiffs' claims have been resolved at this time, and therefore, this Motion will only address the claims of Republic.

[3] This matter was initially filed in the 20th Judicial District Court, Parish of East Feliciana against Omega Flex and Audubon Plumbing, and subsequently removed to this Court by Omega Flex. Further, the claims against Audubon Plumbing were also withdrawn.

and causing the subject fire at Ms. Attuso's home.  Compl.  ¶¶6-8.  The Complaint contains one
(1) count, sounding in negligence, failure to warn, and breach of the implied warranty of
merchantability.

More specifically, Republic alleges that "[a]n inspection of the [Attuso] Residence after
the fire [on January 21, 2017] revealed that a gas line manufactured by Omega Flex, Inc., known
as corrugated stainless-steel tubing ("CSST") was melted and was located in the area where the
fire started.  The CSST was marked with the brand name 'TracPipe,' had a model number of FGP-
SS4-500, and was designed, manufactured, and sold by Omega Flex Inc. … A hole was discovered
in the CSST in the area where the fire started."  "The hole … was created by the electrical energy
imparted on the CSST after lightning struck the house before the fire.  The electrical energy passed
or arced across the ridges of the CSST, which punctured the CSST's thin wall.  Once the CSST's
wall was compromised, natural gas began leaking into the space between the floor and the ceiling
of the [Attuso] Residence.  The gas was ignited … from a competent ignition source..."  Compl.
at ¶¶ 6-7.  Republic further alleges that fire destroyed Ms. Attuso's home.  Compl. at ¶ 21.

In order to support its theories of liability, Republic will need to prove that sufficient energy
from the lightning strike made its way into Mr. Attuso's home to result in electrical arcing and
perforation of unbonded CSST, that propane gas leaving the CSST ignited, that the ignition was
sustained, and that the propane gas escaping the CSST was the first fuel ignited.  In short, Republic
will need to establish causation.

Omega Flex will dispute these assertions.  In particular, Omega Flex will offer evidence
that the CSST was not properly installed at the Attuso home as it was not properly bonded.  Omega
Flex will also offer evidence that propane escaping the CSST could not have been the first fuel
ignited as there was a greater than four (4) hour delay between the lightning strike and the

discovery of the fire; rendering the Plaintiff's theory entirely implausible. Omega Flex will also point to evidence of multiple other fires that resulted from the lightning event.  In short, Omega Flex's position is that its CSST did not cause the fire at Ms. Attuso's home and that the CSST was not properly installed.  Not surprisingly, much of the debate relating to these factual and legal disputes involves opinions of the parties' respective experts. Three (3) of the Plaintiff's experts (who co-authored one shared opinion) regarding susceptibility of bonded CSST, and warnings, are the experts whose opinions are the subject of the instant Motion.

>    **b.**    **Background of CSST**

Before discussing the Integrity experts' joint report and testimony in detail, a discussion of the underlying product, CSST will hopefully provide this Court with additional context regarding the issues in dispute.[4]  TracPipe is a brand of CSST and is commonly used in residences to distribute fuel gas (either natural gas or propane) throughout the structure. CSST is often used either in conjunction with or in place of traditional black iron pipe. Black iron pipe, unlike CSST, must be installed in straight rigid lengths connected by multiple threaded fittings to change directions as the pipe is routed through walls, ceilings, and crawlspaces.

Since CSST is flexible, its installation only requires fittings at junctions and at connections to appliances.  Thus the installation of CSST requires many fewer fittings than the installation of black iron pipe for a similar household configuration. This makes a CSST system less expensive to install than a black iron pipe system, and less prone to leaks. Gas leaks can occur at a fitting due to the fitting not being properly tightened, or to the fitting loosening over time, and are a common safety hazard in homes with gas service.  CSST reduces the risk of gas leaks (due to the reduced

---

[4] The information contained in this introductory paragraph is largely taken from the report of Exponent at Appendix B. This report, including the appendices, is attached as **Exhibit D**. Relevant citations are included in Appendix B.  In addition, the affidavit of Harri K. Kytomaa, Ph.D., P.E., CFEI, additionally provides a detailed background regarding bonding of CSST.  This Affidavit is attached as **Exhibit E**.

number of fittings) and thus is a safer alternative than black iron pipe.  CSST also provides additional safety over black iron pipe in resisting damage from acts of nature, such as earthquakes, tornadoes, landslides, floods and hurricanes.  Any event that causes a shift in the house foundation and/or structure may cause relative movement of two ends of a gas line.  If that gas line is CSST, the inherent flexibility of CSST can accommodate.

CSST products, including TracPipe, are listed by Underwriters' Laboratories (UL) and have been independently tested and found to be suitable for the distribution of fuel gas within a structure in accordance with ANSI LC-1/CSA 6.26 Fuel Gas Piping Systems Using Corrugated Stainless Steel Tubing (CSST).  In addition, CSST is required to be installed only by a qualified installer who has passed the manufacturer's certification/training program.  Indeed, the instructions which accompany Omega Flex's CSST provide that it "*must only* be installed by a qualified person who has been trained or otherwise qualified through the TracPipe Gas Piping Installation Program."  See Omega Flex Design Guide and Installation Instruction, 2005 at p. 3, relevant pages attached hereto as **Exhibit F** (emphasis added).

The alleged attendant risk of CSST is that it is allegedly more susceptible to perforation from an electrical arcing event than black iron pipe resulting from a lightning strike/event.  This is allegedly the result of its thinner walls than black iron pipe which are necessary for the product's flexibility; an attribute with many benefits as discussed above.  However, to combat the purported risk due to lightning, CSST manufacturers, including Omega Flex, require that its product be bonded to the building's grounding electrode (**which it was NOT at the Attuso home**).  See Exponent Report, Exhibit D, Appendix B. See also Kytomaa Affidavit, Exhibit E, at ¶ 10.  The National Fuel Gas Code, a model code cosponsored by the American Gas Association and the National Fire Protection Association, also permits the installation of CSST with bonding and

grounding to mitigate lightning risk.  See National Fuel Gas Code, ANSI Z223.1–2015 (NFPA 54–2015) §§ 5.6.3.4, 7.2.6, 7.3.2, 7.13.2, passim (2015 ed.); National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7, 7.3.2, 7.13.2, passim (2012 ed).  See also Kytomaa Affidavit, Exhibit E at ¶ 10 (noting "direct bonding of CSST to the electrical service ground rod has been a requirement in NFPA 54, [and] the *National Fuel Gas Code* starting in 2009").

Specifically, the Electrical Bonding/Grounding section of the D&I Guide states, "[t]he TracPipe gas system shall be bonded in accordance with these instructions and the National Fuel Gas Code NFPA 54/ANSI Z223.  D&I Guide, Exhibit F, at p. 60. See also Kytomaa Affidavit, Exhibit E, at ¶ 10.  In addition, the Guide states:

> [f]or bonding of the TracPipe® system, **a bonding clamp must be attached** to the brass AutoFlare® fitting adapter … or to a black pipe component (pipe or fitting) located in the same electrically continuous gas piping system as the AutoFlare fitting.  The corrugated stainless steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances.

D&I Guide at p. 60 (emphasis added).  See also D&I Guide, Exhibit F, at p. 3 (warning improper installation can result in fire or explosion).

In this instance, there is no evidence to suggest the installer was certified, and the installation was not performed in accordance with the applicable codes at the time and the D&I Guide, as there was no electrical bond (i.e. the specific safety measure to protect against the failure alleged by Plaintiff).

### c.    The Integrity Report

Mr. Kelly Colwell was disclosed by Republic as an expert regarding, among many other things, the effect, if any, bonding would have had on the cause of the fire, and warnings/instructions provided within Omega Flex's D&I Guide.[5]  These opinions are contained

---

[5] Mr. Kelly Colwell authored a report along with Derek Geer and Johnnie Spriuell; however, neither Mr. Geer and/or Mr. Spruiell were disclosed as experts.

in a joint report, dated February 14, 2019 (Exhibit A).  The report first provides a bulleted list of their combined summarized opinions, along with approximately nine (9) pages of their "bases of opinions."

The Integrity experts' report provides the following fifteen bullet points[6] summarizing their conclusions and/or opinions:[7]

[1.]    At approximately 2:57 am on January 21, 2017, lightning struck the Attuso home generating one arc hole in a section of 3/4" [TracPipe®].  This section was routed within the interstitial space between the ceiling of the kitchen and the floor of an upstairs bonus room.  This arc hole was located within the area where witnesses first noticed the fire.  It is also within the area of origin identified by Mr. Mulkey

[2.]    The fire in the Attuso home occurred when a lightning-induced arc hole was created in the CSST gas piping system.  The propane fuel gas within the … TracPipe® CSST gas piping escaped and was ignited during the arc event. This resulted in a fuel-gas fed fire.

[3.]    The arc event causing the hole occurred between the TracPipe® CSST and a nearby metallic vent duct for the kitchen range's venthood system.  This venthood unit was grounded via an its electrical branch conduit.

[4.]    The identified arc hole is roughly elliptical in shape, about 1.10 by 1.95 mm in overall extent.  The area of the hole is approximately 1.52 square millimeters. Our estimate of charge transfer, based on the Hagenguth equation and assuming the measured 0.012 inches CSST wall thickness is approximately 0.60 coulombs (a measure of electrical charge transfer).

[5.]    The calculated 0.60 coulombs responsible for causing the hole in the yellow jacketed … TracPipe® installed in the Attuso home would not have caused a hole in OmegaFlex's TracPipe® CounterStrike® product.  Nor would 0.60 coulombs have been capable of perforating rigid black-iron pipe.

[6.]    Because of the arc hole, the … TracPipe® CSST used to distribute propane gas throughout the Attuso home failed to contain fuel gas.

[7.]    The gas piping system in the Attuso home was bonded to the electrical ground bus in accordance with the 2005 National Electrical Code via the equipment bonding connections at the gas-fired, tankless water heaters.

---

[6] For the purposes of this Motion, the bullet points have been changed to numbers.
[7] With the exception of bullet points eight nine, and fifteen, the remaining bullet points in the Integrity report are the opinions of experts (Geer and Spruiell) who were not disclosed as experts by Plaintiff.

This also meets the bonding requirement for gas piping as stated in the 2006 Nation Fuel Gas Code, and 2006 International Fuel Gas Code. At the time this home was constructed, there were published and recognized industry standards, though not formally adopted in East Feliciana Parish.

[8.]    The "bonding" as described in Section 4.10 of the OmegaFlex Design and Installation Instructions was not a requirement of the 2005 National Electrical Code, the 2006 National Fuel Gas Code, or the 2006 International Fuel Gas Code.

[9.]    In high voltage testing, we bonded CSST gas piping in the manner depicted in Section 4.10 of the OmegaFlex Design and Installation Instructions. We subjected the CSST to electrical impulse currents at voltage below that of a typical lightning strike. Our physical testing demonstrated that an arc can still occur between the CSST gas piping and another grounding conductive component. The described arc event can result in an arc hole from which the fuel gas can escape from the CSST gas piping.

[10.]    The characteristics of the arc hole observed in the … TracPipe® CSST gas piping recovered from the Attuso home are substantially similar to those created during physical testing in our high voltage laboratory.

[11.]    The fire in the Attuso home was not the result of a malfunction or failure of the electrical service, any electrical branch circuit, or any electrical appliance.

[12.]    Other potential electrical ignition sources within the area of origin as identified by Mr. Mulkey were considered. All other potential ignition sources, except the lightning-induced arc hole in the … TracPipe® CSST gas piping, can be eliminated as a probable electrical cause of this fire.

[13.]    Physical testing in our high voltage laboratory has proven that leaking fuel gas from an arc hole in CSST can, and frequently will, be ignited resulting in a sustained flame. This ignition occurs during the arc event. The arc event consists of the electrical discharge, the melted stainless steel, and the burning yellow jacket.

[14.]    In our 14 years of investigating more than 200 CSST/lightning fires, we have never observed a lightning-induced arc hole in black iron gas pipe.

[15.]    Had yellow jacketed CSST gas piping not been installed in the Attuso home, this fire would not have occurred.

Exhibit A at pp. 2-4. The report goes on to identify the "bases for these opinions," including a description of the circumstances surrounding the cause and origin investigation (performed by

another expert), and the multi-party scene inspection, as well as lab examination.  See, generally, Exhibit A.   The opinions espoused in bullet points 8 and 9 are the subject of the instant Motion.

After summarizing, in general terms, their conclusions relating to the susceptibility of bonded CSST (bullet points 9-10, 13-15) the Integrity experts describe the experiments or tests on bonded CSST gas piping in general, as well as Omega Flex TracPipe as follows:

> Multiple capacitors were charged to 17,000 volts and discharged onto the CSST gas pipe in contact with a grounded conductor, consistent with residential wiring and terminated at the same ground bus as the 'heavy gauge bonding wire.'  Both the outer sheathing of the CSST and the type NM cable were pin-pricked to discharge.  [They] found that … arcing occur[ed] [and] produc[ed] perforations in the gas piping … These perforations occurred at numerous distances along the length of gas piping … The characteristics of the holes created in [their] testing are consistent with the arc hole in this matter…

Exhibit A at pp. 10-11.  However, there is nothing within the report to suggest that the Integrity experts made any attempt to model the Attuso home.  That is, there is nothing in the repot to suggest that the Integrity experts in any way attempted to apply the laboratory tests from an unrelated matter to this case.

Additionally, in connection with their opinions relating to the D&I Guide (bullet points nos. 8-9), the Integrity experts looked at one provision, specifically, Section 4.10, which pertains to specific "Electrical Bonding/Grounding" instructions for Omega Flex products.[8]  Exhibit A at p.10.  The Integrity experts focus on the last sentence of the provision, which states, "[t]he bonding

---

[8] Section 4.10 of the D&I guide states as follows:

> For bonding of the TracPipe® system, a bonding clamp must be attached to the brass AutoFlare® fitting adapter (adjacent to the pipe thread area – see Figure 4.21) or to a black pipe component (pipe or fitting) located in the same electrically continuous gas piping system as the AutoFlare® fitting. The corrugated stainless-steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances.  Bonding electrode conductor sizing shall be in accordance with Article 250 [Table 250-66] of ANSI/NFPA70.  **The bonding requirement is a requirement of the National Electrical Code.**

Exhibit A at p. 10 citing 2005 Omega Flex D&I Guide, (emphasis added).

requirement is a requirement of the National Electrical Code." Id.  Mr. Colwell claims that this statement is incorrect, and further attempts to frame the D&I Guide as ambiguous or confusing, simply because Section 4.10 requires additional bonding, involving a "heavy gauge bonding wire and a bonding clam," in excess or outside of the bonding required by the National Electrical Code. Id. at p. 10.  The report provides absolutely no guidance or explanation as to why a manufacturer is confined to the requirements of the National Electrical Code, nor does the report provide any comments or opinions regarding the actual bonding instructions contained within Section 4.10. See generally, Exhibit A.

> **d.    The Integrity Experts' Testimonies**

The three (3) Integrity experts were deposed on May 14, 2019, and a condensed version of their transcripts are attached hereto as **Exhibit B** (Colwell Transcript), **Exhibit C** (Spruiell Transcript) and **Exhibit G** (Geer Transcript).

> ***i.    Background Regarding Integrity Experts***

> **a.    Expert Colwell**

Mr. Colwell testified regarding his background and offered further guidance regarding his opinions within the Integrity experts' report.  Mr. Colwell's background is as an electrician.  See Exhibit A at p. 13; Exhibit B at p. 132.  Mr. Colwell is not a certified fire investigator ("CFI") or a certified fire and explosion investigator ("CFEI").  See Exhibit A at p. 13 (Colwell resume).  He has never installed CSST in a residence, has not overseen the installation of CSST in a residence, and is not a metallurgist.  Furthermore, Mr. Colwell is not a warnings expert or an expert in writing instructions for products, does not have any degrees or experience with human factors analysis, and has never written a warning for any product.  Exhibit B at 120-21.  See also Exhibit B at pp. 84-86 (Colwell is not offering any opinion regarding the sufficiency of warnings within the D&I Guide, outside that he dislikes that the D&I Guide exceeds the codes' requirements).  Furthermore,

Mr. Colwell admitted that he "didn't know what the installer did" in this instance. Exhibit B at p.86. Mr. Colwell also agreed the Integrity Report (Exhibit A) contains the entirety of the opinions he is going to offer. Exhibit B at pp. 80-81. Specifically, Mr. Colwell testified that he would only offer testimony regarding certain opinions within the Integrity report, namely bullets seven through nine, and bullet fifteen.[9] See Exhibit A at p. 2-4; Exhibit B at pp. 103-104. In addition to his interpretation of the D&I Guide, Mr. Colwell offered testimony regarding the effectiveness of bonding, and in particular, that even if the CSST at issue at the Attuso home had been bonded in accordance with the D&I Guide, the arcing event would still have occurred. See Exhibit B at pp. 33-35. That testimony is discussed *infra* in detail.

### b.    Non-Disclosed Expert Spruiell

Mr. Spruiell testified regarding his background and offered further guidance regarding his opinions within the Integrity report. Mr. Spruiell's background is as a mechanical engineer. Exhibit A at p. 14. He is not a CFI or a CFEI. See Exhibit A at p. 14 (Spruiell Resume). Moreover, Mr. Spruiell is not licensed to install gas piping or certified to install CSST, has never installed CSST, and is not a metallurgist. Exhibit A at p. 14. Mr. Spruiell also agreed (that with the exception of rebutting Omega Flex's expert opinions) the Integrity Report (Exhibit A) contains the entirety of the opinions he is going to offer. Exhibit C at pp. 14-16.

In particular, Mr. Spruiell testified that he would only testify regarding certain opinions in the Integrity report, specifically bullet points four and five, and bullet points six, ten, thirteen, and

---

[9] Mr. Colwell also testified that he was going to be offering the opinion that the propane gas left the CSST and was ignited during the arcing of that (bullet point 3); however, he admitted that he "believed that to be the case, *but* Mr. Spruiell [was] going to handle more of that," and he was relying on "Mr. Spruiell and his opinions with regard to the capability of the gas to ignite and sustain." Exhibit B at pp. 92-93.

fifteen.[10]  Exhibit A at pp. 2-4; Exhibit C at pp. 12-13.  Further, Mr. Spruiell acknowledged that he was not going to offer an opinion regarding whether or not the CSST at the Attuso home was properly installed, and had never offered an opinion regarding an installer improperly bonding CSST.  Exhibit C at p. 32.  See also Exhibit C at pp. 12 (testifying that he did not know he was making opinion regarding design defect in this case), 31-32 (testifying that he is not familiar with bonding requirements), and 40-41 (testifying that he has no idea regarding bonding requirements in effect at time of Attuso fire).

### c.    Non-Disclosed Expert Geer

Likewise, Mr. Geer testified regarding his background and offers further guidance as to his opinions contained within the Integrity experts' report.  Mr. Geer's background is as a mechanical engineer.  See Exhibit A at p. 14; Exhibit G at p.20.  Mr. Geer is not a CFI; however, he is a CFEI (for approximately ten years).  Exhibit G at p. 19.  He has never installed or overseen the installation of CSST, nor is he licensed to install gas piping, and is not a metallurgist.  Exhibit G at pp. 19-20.  Mr. Geer testified that he would *only* testify regarding or offer certain opinions in the Integrity report; specifically, regarding the "form of the experiment, the instrumentation used, and the voltage values … and then, in terms of the house, the opinion regarding where did the gas system go and how did we isolate a leak."  Exhibit G at pp. 50-51.  He acknowledged that he was not offering an opinion regarding the installation of the CSST at the Attuso home and whether that installation was improper (Exhibit G at pp. 25-26, 42), causation of the fire at issue (Exhibit G at pp. 31-32), any alleged design defect (Exhibit G at p. 50), or any instructions or warnings that were included in the D&I guide (Exhibit G at p. 50).  Further, with respect to bonding and/or the efficacy

---

[10] With respect to bullet point fifteen (had yellow-jacketed CSST not been installed in the Attuso home, the fire would not have occurred), Mr. Spruiell testified that he 1) assumed that the gas escaping the CSST was the first fuel ignited and 2) relied on the opinions of the cause and origin expert and Mr. Colwell.  Exhibit C at pp.34-35.

of bonding, Mr. Geer testified that he ran the test apparatus, but again his opinions are limited to the "form of the experiment, the instrumentation used, and voltage values." See Exhibit G at pp. 35, 50-51.

### ii.    Testimony Regarding Susceptibility of Bonded CSST

Mr. Colwell (and, to an extent, Mr. Geer, who offered testimony regarding the testing that Integrity performed),[11] was examined regarding the opinion and/or testimony relating to the susceptibility of bonded CSST; specifically that the Attuso fire would have occurred even if the CSST was bonded. See Exhibit A at p. 3 (bullet point 9); Exhibit B at pp. 33-35. During the depositions it became evident that this opinion is entirely irrelevant given Integrity's failure to apply their tests to the facts involved in this action.

As discussed *supra*, in connection with this opinion, the Integrity experts performed testing where they pin-pricked the outer sheathing of the CSST and cable before discharging 17,000 volts onto the CSST gas pipe with a bond. See Exhibit A at p. 9; Exhibit B at pp. 93-94 (acknowledging the testing involved pinpricks; however, there was no information that the CSST at the Attuso home was pinpricked).[12] See Exponent Report, Exhibit D, at pp. 60-61; Kytomaa Affidavit, Exhibit E at ¶¶ 11-12 (noting that the capacitor array used in the testing was only capable of discharging 17 kv, which is much lower than voltages generated by lightning, and required pinpricking of the CSST). By pinpricking the CSST and the opposing cable, the Integrity witnesses created a pathway that encouraged an arcing event when such a condition did not exist at the Attuso home. See Kytomaa Affidavit, Exhibit E at ¶¶11-13 (describing testing and noting

---

[11] Mr. Geer limited his testimony and opinions to the testing that was actually performed. See Exhibit G at pp. 50-51. See also Exhibit B at p. 36 (noting Mr. Geer actually performed the testing).

[12] Kytomaa Affidavit, Exhibit E at ¶¶ 11-12. See also Exponent Report, Exhibit D, at pp. 60-61 (explaining that pinpricking and/or modifying the CSST effectively encourages arcing and is of significance as to whether or not bonding is effective).

that "[b]y modifying the jacket on the CSST and modifying the insulation of the branch circuit wire, the Integrity test have ensured that the voltage is sufficient to initiate an arcing loss. Thus, [the] tests do not evaluate whatsoever the first mechanism by which bonding may be effective: i.e. reducing the voltage").

Moreover, the testing performed in the Integrity laboratory in no way resembled the configuration of the Attuso home.  See Kytomaa Affidavit, Exhibit E, ¶¶ 16-19.  For example, and perhaps most importantly, Integrity created a preferential pathway to ground through the opposing electrode.  That is, Integrity utilized a short branch circuit wire which in no way relates to the lengthy exhaust duct at the Attuso home.  See Kytomaa Affidavit, Exhibit E, at ¶¶11-16, 19.  By creating a more preferential pathway to ground, Integrity created a situation where an arcing event was likely to occur.  Id.  However, this situation is not at all applicable to the Attuso home.  Id.  In addition, the Integrity witnesses placed the CSST and the opposing electrode in contact with each other; again a situation in no way represents the configuration of the Attuso home.  Id.  All that the Integrity tests evidence is that there are some situations where bonding may not be effective, but NO attempts were made to ensure that bonding would not be effective *at the Attuso home*.  Id.  See also Exponent Report, Exhibit D at pp. 60-61; Kytomaa Affidavit, Exhibit E at ¶¶ 11-12, 16-18.  However, despite his tests, Mr. Colwell agreed that bonding can be effective:

> Q.    **Okay. Would you agree with me that bonding does decrease the probability that there will be an arcing event involving CSST?**
>
> A.    **It's possible.**

Exhibit B at p. 35 (emphasis added).  However, despite this acknowledgement, Integrity did not perform testing specific to the Attuso home in order to verify whether bonding would have been effective in this case.

14

### iii.    Testimony Regarding Omega Flex D&I Guide

Of the Integrity experts, Mr. Colwell is the one expert that intends to offer testimony and/or opinions relating to the D&I Guide, and the sufficiency of the instructions, particularly relating installation of the CSST, within the Guide.  See Exhibit A at p. 3; Exhibit B at p.84 (Colwell noting that he is not going to offer any opinion regarding the sufficiency of the any warning contained in the D&I guide); Exhibit C at pp. 12-13 (identifying the opinions Mr. Spruiell was offering); Exhibit G at p. 50 (admitting Mr. Geer was not going to offer any opinion regarding the instructions or warnings in the D&I guide).

Specifically, it is Mr. Colwell's opinion that certain instructions within the D&I Guide, in particular the instructions relating to bonding of the CSST as depicted in Figure 4-21 of Section 4.10 'Electrical Bonding/Grounding' is confusing or unclear.  However, during his deposition, it became clear that this opinion is entirely based on his own assumptions and/or personal beliefs; rather than any scientific or recognized methodology.[13]  See Exhibit A at p. 2, 10; Exhibit B pp. 84-86.

As discussed *supra*, Section 4.10 of the D&I Guide states as follows:

> For bonding of the TracPipe® system, a bonding clamp *must be attached* to the brass AutoFlare® fitting adapter (adjacent to the pipe thread area – see Figure 4.21) or to a black pipe component (pipe or fitting) located in the same electrically continuous gas piping system as the AutoFlare® fitting.  The corrugated stainless-steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances.  Bonding electrode conductor sizing shall be in accordance with Article 250 of ANSI/NFPA70.  The bonding requirement is a requirement of the National Electrical Code.

Exhibit A at p. 10 citing 2005 Omega Flex D&I Guide.

---

[13] Although the report cites to NFPA 921, Mr. Colwell testified this was more to assist the origin and cause investigator.  See Exhibit B at p. 91.

Mr. Colwell's opinion regarding Section 4.10 of the D&I Guide is premised on his personal belief that the last sentence, stating that, "the bonding is a requirement of the National Electrical Code" is confusing because although bonding is required within the National Electrical Code, the particular bonding described in Section 4.10 is not. Exhibit B at pp. 84-86. In short, Mr. Colwell testified that he believed the D&I Guide was confusing as it does "not stat[e] clearly that [the instructions] … exceeds the code requirement and [do not] highlight[] to the people who are doing the bonding that this is needed and [the guide] doesn't." Exhibit B at pp. 85-86. See also Exhibit B at pp. 70-71.

Mr. Colwell, however, is admittedly not a warnings expert, nor has he ever written instructions for the installation of a product and has no experience with human factors. Exhibit B at pp. 120-21. Further, when asked regarding Omega Flex's training regarding bonding a CSST system, Mr. Colwell testified that he was unaware of what occurs during Omega Flex's required training. Exhibit B at p. 85. Despite this opinion, however, Mr. Colwell admitted that manufacturers are not limited or confined to the National Electrical Code, and can in fact have requirements in excess or outside of the Code. Exhibit B at pp. 84-85. See also Exhibit B at pp. 72-73 (noting within the NEC or NFPA 54 that says Omega Flex (or another manufacturer) cannot require direct bonding or more than the code requires). In particular, Mr. Colwell testified as follows:

> Q.    And again your issue is that Omega Flex is requiring something that is in excess of the code?
>
> A.    Yes.
>
> Q.    Okay … can't they require something in addition to the code?
>
> A.    Yes, they can. ***But to me***, they need to state [] that it's in addition that's in excess of the current codes and not say this is a requirement of the code.

Q.     Okay. And so your issue is with the way they worded it in the D[&]I Guide?

A.     My issue is that they're not stating clearly that is, this exceeds the standards that are published at this point.  Just basically, this exceeds any code requirement and highlighting that they need to make it aware to the people who are doing the bonding that this is needed and it doesn't …

Q.     Right but Omega Flex states that you need it in the D[&]I Guide; is that right? They say that you must include the bonding clamp; is that right?

A.     Yes.

* * *

Q.     Okay,

A.     But all I'm saying is, it is not a requirement of the code.  It exceeds the code. And none of the codes say this has to be done.  ***To me,*** that's where confusion obviously has come into play …

Exhibit B at pp. 84-86 (emphasis added).  Mr. Colwell provided no support or basis for this conclusion beyond his own belief.  Id. (noting that he personally felt Omega Flex should add a statement that the requirement is in excess of the code and/or an *additional* statement that use of the bonding clamp is required).

Mr. Colwell's belief, however, also ignores not only the D&I Guide in general, as well as the need to use the guide in connection with CSST installation, but also that Omega Flex (like many other manufacturers) requires that installers be certified and receive the necessary training prior to installing their product.[14] Admittedly, apart from his generic and unsupported opinion that this provision is ambiguous as a result of one sentence, Mr. Colwell has no knowledge regarding whether the installer in this case found the instructions to be confusing.  See Exhibit B at pp. 72, 86.  In fact, Mr. Colwell testified to the following:

---

[14] Although Mr. Colwell is not certified to install Omega Flex CSST, Mr. Colwell is clearly aware that manufacturers often require installers to be certified and trained specifically with their products, as he is a certified installer of another manufacturer's CSST product.  Exhibit B at p. 84.

Q.      And so we have no information that the installer here read the instructions; is that correct?

A.      I have not spoken to the installer in this case.  I don't know what he has read and what he hasn't . . .

Exhibit B at p. 72.  In addition, Mr. Colwell testified:

Q.      But in any event, here the installer didn't read - - or we have no information that [the installer] read the D&I guide.  *So we can't say that he read the D[&]I guide the way that you read it?*

A.      *I don't know what the installer did.*

Exhibit B at p. 86 (emphasis added).  Furthermore, Mr. Colwell testified as follows:

Q.      And here, have you spoken with the individual that installed the CSST at the Attuso home?

A.      No.  I have not.

Q.      Do you know who it is?

A.      I was told Audubon Plumbing.

Q.      Do you know who [at] Audubon Plumbing installed it?

A.      No, not as I sit here right now.

Q.      Do you have any knowledge as to whether or not anybody at Audubon Plumbing was certified to install Omega Flex CSST?

A.      I have heard they weren't.

Q.      Okay.

A.      … I haven't spoken with anybody from Audubon Plumbing.

Exhibit B at pp. 69-70.

## III.   LEGAL STANDARDS

### a.     Federal Rule of Civil Procedure 26

Pursuant to the Federal Rules of Civil Procedure, expert reports must be "detailed and complete."  <u>See</u> Fed. R. Civ. P. 26 Advisory Committee's note (stating a complete report must

include the substance of the testimony which an expert is expected to give together with the reasons therefor); see also Honey-Love v. United States, 664 Fed. Appx. 358, 361 (5th Cir. 2016). Specifically, an expert report must contain "the data or other information considered… in forming" the conclusions or "any exhibits that will be used to summarize or support" the conclusion.  See Fed. R. Civ. P. 26 (a)(2)(B)(ii)-(iii) .  Further, "'an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation.'" Payne v. Brayton, 2017 U.S. Dist. LEXIS 6602 at *6 (E.D. Tex. Jan 18, 2017) citing R.C. Olmstead, 606 F.3d at 271.  Specifically, "'[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'"  Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n. 6 (7th Cir. 1998).  See also R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010) citing Hilt v. F.F.C., Inc., 170 F.R.D. 182, 185 (D. Kan. 1997) (stating "[a]n expert 'report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them'").  "[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  Brainard v. American Skandia Life Assur. Corp., 432 F.3dd 655, 664 (6th Cir. 2005) citing Mid-State Fertilizer Co. v. Exch. Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989).

    **b.**    **Federal Rule of Evidence 702**

Federal Rule of Evidence 702 provides the standard governing a court's determination of whether to admit scientific or other expert testimony.  It allows opinion testimony from "a witness who is qualified as an expert by knowledge, skill, experience, training, or education," but only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule incorporates the principles established in <u>Daubert v. Merrell Dow</u> <u>Pharms., Inc.</u>, 509 U.S. 579, 589 (1993) in which the Supreme Court charged trial courts with a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  <u>Hathaway v. Bazany</u>, 507 F.3d 312, 317 (5th Cir. 2007); <u>In re Pool Prods.</u> <u>Distribution Mkt. Antitrust Litig.</u>, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (clarifying that the <u>Daubert</u> gatekeeping function applies to all forms of expert testimony).

     **c.**     **<u>Daubert and its Progeny</u>**

Under <u>Daubert</u>, a Court has two roles: determining whether the evidence is reliable and analyzing whether the evidence is relevant.  <u>Daubert</u>, 509 U.S. at 590-593. <u>See</u> <u>also</u> <u>United States</u> <u>v. Cooks</u>, 589 F.3d 173, 179 (5th Cir. 2009).  The Fifth Circuit has explained the meaning of "reliable" and "relevant" in this context in these terms: "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid [and] [r]elevance depends upon whether [that] reasoning or methodology properly can be applied to the facts in issue."  <u>Leblanc v. Chevron USA, Inc.</u>, 396 F. App'x 94, 97 (5th Cir. 2010) <u>Knight v. Kirby</u> <u>Inland Marine Inc.</u>, 482 F.3d 347, 352 (5th Cir. 2007).  Courts must focus "solely on principles and methodology, not on the conclusions that they generate."  <u>Id.</u> at 595; <u>Moore v. Ashland Chem.,</u> <u>Inc.</u>, 151 F.3d 269, 275-76 (5th Cir. 1998) (same); <u>Watkins v. Telsmith, Inc.</u>, 121 F.2d 984, 988-89 (5th Cir. 1980); <u>In re Pool Prods.</u>, 166 F. Supp. 3d at 661 (the "aim is to exclude expert testimony based merely on subjective belief or unsupported speculation").  <u>See</u> <u>also</u> <u>Wells v.</u> <u>Smithkline Beecham Corp.</u>, 601 F.3d 375, 378 (5th Cir. 2010) ("Although there are no certainties in science, the expert must present conclusions ground[ed] in the methods and procedures of science"); <u>Tamraz v. Lincoln Elec. Co.</u>, 620 F.3d 665, 675 (6th Cir. 2010) ("The important thing is not that experts reach the right conclusion, but that <u>they reach it via a sound methodology</u>").

*1.  Reliability Element Under Daubert Standard*

Reliability can be assessed in a number of ways.  Testimony can be reliable if it is "based on sufficient facts or data," or "the product of reliable principles and methods" which the expert in turn has applied to the facts of the case.  Fed. R. Evid. 702.  See also 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000) (a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise.")  In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue.  Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382b (5th Cir.1996).  Courts within the Fifth Circuit have repeatedly held that despite a Court's discretion, "expert testimony must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et. alia."  In re Pool Prods., 166 F. Supp. 3d at 662 citing Knight, 482 F.3d at 355 (5th Cir. 2007).  See also Moore, 151 F.3d at 278 n. 10 (any step that renders an opinion unreliable is inadmissible, even if that step merely misapplies or changes a reliable methodology).  "Where the expert's opinion is based on insufficient information, the analysis is unreliable."  Id. citing Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 388 (5th Cir. 2009).  See also Garcia v. BRK Brands, Inc., 266 F. Supp.2d 566, 573-74 (S.D. Tex. May 27, 2003) (noting to be deemed reliable the opinion "must be grounded in the method and procedures of science" and "must be more then mere subjective belief" or speculation).

Further, when considering reliability Daubert dictates that trial courts should consider the following non-exclusive factors: (1) whether a theory or technique can be and has been tested; (2)

whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the technique is "generally accepted" within the "relevant scientific community." Hathaway, 507 F.3d at 318 citing Daubert, 509 U.S. at 593-94. See Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012) (reiterating non-exclusive factors considered when conducting reliability inquiry). The focus of a court's evaluation should be on whether an expert's testimony "is scientifically valid," by examining the non-exclusive set of factors outlined above, thus "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 580, 600 (emphasis added). See also Wells, 601 F.3d at 378 ("Although there are 'no certainties in science,' the expert must present conclusions 'ground[ed] in the methods and procedures of science.")

## 2. Relevance Element Under Daubert Standard

In terms of relevance, the key question is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. In re Pool Prods., 166 F. Supp. 3d at 662 citing Daubert, 509 U.S. at 591. "[F]undamentally unsupported opinions "offer[] no expert assistance to the jury" and should be excluded. Id. citing Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005). See also Diggs v. Citigroup, Inc., 551 F. App'x 762, 764-65 (5th Cir. 2014); McCune v. Graco Children's Prods., Inc., 495 F. App'x 535, 539 (5th Cir. 2012) (per curium). See also Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (noting "fundamentally unsupported opinions offer[] no expert assistance to the jury" and should be excluded); In re Pool Prods., 166 F. Supp. 3d at 662.

"In short, under Daubert and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and

will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 n.10. See Garcia, 266 F. Supp. 2d at 573-74. Again, an expert's opinion must be based on methods and procedures of science, rather than on subjective belief or unsupported speculation. See Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 ("This requirement, [that the testimony assist the trier of fact] has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result(s) being offered and the disputed factual issues in the case in which the expert will testify"). Likewise, Rule 702 "requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citation and internal quotation marks omitted). "[A]n expert's opinion should not be admitted if it does not apply to the specific facts of the case." Diggs v. Citigroup, Inc., 551 F. App'x 762, 765 (5th Cir. 2014) citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 154 (1999). For example, in Gen. Elec. Co. v. Joiner, the Supreme Court explained that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Atlantic Specialty Ins. Co. v. Porter, Inc., 2016 WL 6569346 at *3 (E.D. LA. Nov. 4, 2016) citing Joiner, 522 U.S. 136, 146 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id.; see also LeBlanc, 396 Fed. Appx. at 98; De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd., 2015 U.S. Dist. LEXIS 182435 at *4 (N.D. Tex. Jan. 21, 2015).

## IV.    LEGAL ARGUMENT

### a.    Integrity Experts Cannot Render the Opinion that the Attuso Fire Would

**Still Have Occurred if the CSST was Bonded.**

The Integrity experts cannot reliably render an opinion or testimony that the subject fire would have occurred even if the CSST was bonded as there is no connection between the testing being offered to support that opinion and the facts of the Attuso incident.  As explained below, the Integrity experts rely on tests, unrelated to the Attuso matter or the Attuso home, in which arcing events occurred with bonded CSST. However, those tests are unreliable as the tests encouraged arcing and in absolutely no way resemble the configuration at the Attuso home.

Expert testimony must show that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case.  Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 n.10.  An expert's opinion cannot be based on subjective belief or unsupported speculation; but rather, must be based on methods and procedures of science.  Leblanc, 396 F. App'x at 97; Knight, 482 F.3d at 352; In re Pool Prods., 166 F. Supp. 3d at 662.  Courts must focus "solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595; Moore, 151 F.3d at 275-76 (explaining focus is not on the result or conclusion, but on the methodology); Watkins, 121 F.2d at 988-89.

Moreover, the "requirement, [that the testimony assist the trier of fact] has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result(s) being offered and the disputed factual issues in the case in which the expert will testify."  See Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592. An expert's opinion that does not apply to the specific facts of the case should not be admitted.  See Diggs, 551 App'x at 765; Boulle, 2015 U.S. Dist. LEXIS at *4.

For example, in Garcia, a district court within the Fifth Circuit reviewed in part, the court's Daubert ruling, which precluded plaintiff's experts from testifying as the experts failed to perform

testing related to the facts of the case, and instead were made on mere "unsupported speculation." 266 F. Supp. 2d 566 (S.D. Tex. May 27, 2003). In that case, the plaintiffs alleged a smoke detector defect was the cause of the decedent's death, specifically the detector's failure to alarm as a result of "fretting corrosion" between the horn element and horn driver circuit. Id. at 569. The court noted that all of the plaintiffs' claims ultimately required proof that the detector should have alarmed before the decedent became incapacitated by carbon monoxide. Id. at 570-71. In particular, the court in its review found that none of the plaintiffs' experts applied the facts of the case at hand to their testing, using different smoke detector models and failing to make "sufficient attempts to replicate the conditions in [the decedent's] residence prevailing at the time of his death." Id. at 575. Moreover, the court concluded that although the experts' opinion was "certainly plausible," it was insufficient under Daubert as at most it was "scientifically grounded speculation." Id. at 577.

As discussed *supra* the Integrity experts' opinion and related testimony (as put forth primarily by Mr. Colwell) that even if the CSST in the Attuso home had been bonded the fire would still occur is dubious and unconvincing, as the Integrity experts did not attempt to account for or even acknowledge certain limitations in their more standardized testing, nor does the test "fit" the facts of the case; namely there is no connection between the research/testing being offered and the facts of the Attuso incident. Simply put the Integrity experts' proposed testimony and/or opinion that the fire at the Attuso home would have occurred even if the CSST was bonded does not rest on a reliable foundation, nor can it be considered relevant to the facts of the case.

Indeed, Mr. Colwell agreed that it is possible that bonding decreases the probability that there will be an arcing event involving CSST. Exhibit B at p. 35. However, despite this acknowledgement, the testing performed by Integrity performed to support the opinion that the

hole in the Attuso CSST would have occurred *had the Attuso home been bonded* in accordance with the applicable D&I Guide was not specific to the Attuso home, and further, the hole(s) that resulted from this testing was much larger than the hole at issue in the CSST in this instance.  See Exhibit B at pp. 32-34, 36-37 (acknowledging that the wires used in their testing was a "very short length… offering very low resistance); Exhibit G at pp. 49-50. See also Exponent Report, Exhibit D, at pp. 60-61. The testing is fundamentally unrepresentative of the configuration of a typical house (let alone the Attuso home).  Kytomaa Affidavit, Exhibit E at ¶¶ 11-12 (acknowledging the low voltage of the Integrity test, and the need to modify the CSST and branch circuit wiring in order to create an arc); ¶ 16-18 (discussing that the Integrity testing did not reflect the configuration of the Attuso home).  For example, Integrity created a preferential pathway to ground through the opposing electrode. See Kytomaa Affidavit, Exhibit E, at ¶¶15 (noting that the effectiveness of bonding in terms of diverting a charge depends heavily on the electrical impedance through bond wire; hence why a shorter bond wire encourages a more preferential path).  That is, Integrity utilized a short branch circuit wire which in no way relates to the lengthy exhaust duct at the Attuso home.  By creating a more preferential pathway to ground, Integrity created a situation where an arcing event was likely to occur.  Id.

Moreover, this testing actually *encouraged* arcing events, as the equipment used by the Integrity experts was only capable of generating up to 17,000 volts, despite that the dielectric strength of the TracPipe jacket is approximately 25,000 volts.  Therefore, they would never observe arcing with unmodified TracPipe. Exponent Report, Exhibit D, at pp. 60-61; Kytomaa Affidavit, Exhibit E, at ¶¶ 11-12.  See also Exhibit A at p. 10.  Therefore, Plaintiff's experts had to modify the CSST by piercing (or pin-pricking) the insulating jack on the branch circuit wiring and then place the wiring in contact with the TracPipe.  Exponent Report, Exhibit D, at p. 61;

Kytomaa Affidavit, Exhibit E, at ¶ 12.  See Exhibit G at p. 49 (noting "we had to prick the outer jacket because we didn't have a voltage capable of overcoming the ... breakdown voltage of the [CSST's] sheath").  Both of which are of great importance in testing the effectiveness of bonding. Exponent Report, Exhibit D, at p. 61, Kytomaa Affidavit, Exhibit E at ¶¶ 12-15.  Notably, no attempts were made to ensure that bonding would not be effective *at the Attuso home*.

Similar to the experts in Garcia, who failed to make any attempt to fit the conditions of the case to their tests, here the Integrity experts have failed to apply any of the specific facts of this case to their testing; instead simply relying on their more generalized or standard testing.  See Garcia, 266 F. Supp.2d at 573-74.   Notably, the Integrity experts lack rationale as to why additional testing relating to and replicating the facts/circumstances in this instance was not performed.

In summary, the Integrity experts should be precluded from offering the opinion and/or related testimony that this fire would have occurred if the CSST was bonded, as Integrity failed to take any steps to apply this test to the facts at hand.

> **b.   Mr. Colwell cannot render the opinion that certain instructions within the Omega Flex D&I guide are confusing, as he is neither qualified, nor will it assist the trier of fact.**

The Integrity experts, particularly Mr. Colwell, also cannot opine or offer testimony that the D&I Guide, particularly Section 4.10, is ambiguous or confusing as he is not qualified to make such an opinion, nor will his opinion aid or assist the trier of fact.

> *1.   Mr. Colwell is not qualified to render an opinion regarding Omega Flex's instructions.*

Mr. Colwell, as an electrician, and not an expert in writing instructions or human factors, is not qualified to offer an opinion regarding Omega Flex's D&I Guide instructions, and whether or not those instructions are confusing and/or ambiguous.

27

Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Tajonera v. Black Elk Energy Offshore Operations, L.L.C., 2016 U.S. Dist. LEXIS 40416, at *59 (E.D. La. Mar. 28, 2016). In order to offer a qualified opinion, the subject of the opinion or testimony must lie within the witness's area of expertise. See also 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999). In other words, one who purports to be an expert must truly have expertise concerning the actual subject about which they are offering an opinion. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998). See Sittig v. Louisville Ladder Grp. LLC, 136 F. Supp. 2d 610, 616 (W.D. La. 2001) (noting Rule 702 requires that the expert be qualified in the relevant field). See, e.g., Clark v. R.D. Werner Co., Inc., 2000 U.S. Dist. LEXIS 7574 (E.D. La. 2000) (finding a metallurgical expert, who had no experience in designing ladders, unqualified to render expert opinion because he "failed to address the central issue of this case at sufficient level of intellectual rigor in the field of ladder design.")

For example, in Runnels v. Tahsin Indus. Corp., the plaintiff asserted among others an inadequate warnings and instructions claim against the defendant who manufactured a ladderstand and ladder extension used to hunt game from an elevated position. Runnels, 2013 WL 6834632, at * 1. Plaintiff offered three experts for such an opinion. The first proffered expert held a bachelor of science degree in industrial technology and was retained as "an expert in the field of hunting safety and outdoor recreation." 2013 WL 6834632 at *3-4. The expert was not an "accident

reconstructionist, design engineer, metallurgist, or materials expert, and he [had] no experience relating to the design or manufacture of ladderstands." 2013 WL 6834632 at *4. Further, this expert admitted that "he [had] never been involved in the process in which instructions or warnings for ladderstands or any hunting products were drafted." Id. The expert also failed to identify "any training or experience that would qualify him as a human factors expert." Id. The court therefore held that the expert's lack of sufficient practical experience and knowledge precluded him from providing expert opinions about warnings and instructions in this case. Id.

Additionally, the second proffered expert "graduated with a bachelor of science in physics in 1959 and a doctor of philosophy in materials science in 1970." 2013 WL 6834632 at *5. "He also engaged in graduate studies in metallurgy" and had "more than 50 years of experience in materials science and at least 20 years of experience in failure analysis." Id. The expert was designated as "an expert in physics, materials science, failure analysis, equipment design and manufacturing, and metallurgy." Id. Notably, the second expert did not "hold himself out as a human factors expert" and had "never been qualified as a warnings or human factors expert in federal court." 2013 WL 6834632 at *6. The court found the expert's "opinions regarding the warnings and instructions [were] not logically connected to his areas of expertise," and therefore, he was also precluded from offering such an opinion. Id. Lastly, the third proffered expert in Runnels "graduated with a doctorate of philosophy in mechanical engineering" and was "a licensed professional engineer in 29 states" and was designated as an expert in mechanical engineering. 2013 U.S. WL 6834632 at *7. While the third expert testified in his deposition that he had previously provided expert opinion on matters involving warnings and instructions, the court determined that the "testimony [did] not establish that his engineering expertise [was] logically connected to his opinion that the warnings and instructions of ladderstands and ladderstand

29

extensions were inadequate…"  2013 WL 6834632 at *8.  The third expert in <u>Runnels</u> was also "unqualified to testify as to the adequacy of the ladderstand's warnings and instructions."  <u>Id</u>.

Much like the proffered experts in <u>Runnels</u>, Mr. Colwell's experience and/or background is not logically connected (in any way) to an opinion regarding the instructions provided with CSST.  Admittedly, Mr. Colwell is not an expert in warnings nor does he have any experience with human factors analysis.  Exhibit B at 120-21.  Moreover, Mr. Colwell (although certified to install another manufacturer's product) is not certified to install TracPipe, nor has he ever installed or overseen the installation of CSST in a residence.  Exhibit B at p. 84.  <u>See</u> <u>also</u> Exhibit A at p. 13 (Colwell resume).  Further, Mr. Colwell has never written instruction or warnings for any product.  Exhibit B at pp. 120-21.  Without any related expertise, experience and/or background in human factors, warnings and/or instructions, it would seem too far a stretch to consider Mr. Colwell qualified to offer an opinion concerning the adequacy/inadequacy of instructions under Rule 702 and <u>Daubert</u>.

In summary, Mr. Colwell cannot be considered qualified, as required under Rule 702, and <u>Daubert</u> and its progeny, to offer an opinion regarding Omega Flex's instructions, as he is not an expert in instructions or warnings, and does not have any experience with human factors analysis and has never written an instruction for any product.

> 2.  *Mr. Colwell cannot render the opinion that certain instructions within the Omega Flex D&I guide are confusing as his opinion is not reliable nor based on reliable methodology.*

As discussed *supra*, Mr. Colwell's opinion regarding the instructions within Section 4.10 of the D&I Guide stems from his own personal beliefs, and therefore, cannot be viewed to be reliable and/or in compliance with Federal Rule 26.  <u>See</u> Exhibit B at pp. 70-71, 85-86.  During his deposition, Mr. Colwell testified that the Omega Flex D&I guide is unclear and/or confusing because Section 4.10 fails to state that the bonding requirement is a requirement of the National

Electrical Code" or alternatively stat[e] clearly that [the instructions] … exceeds the code requirement and [do not] highlight[] to the people who are doing the bonding that this is needed and [the guide] doesn't."  Exhibit B at pp. 85-86.  See also Exhibit B at pp. 70-71.  See also Exhibit B at p. 84-86 (acknowledging that although bonding is required within the National Electrical Code, the particular bonding described in Section 4.10 is not).  Mr. Colwell provides no support for this position beyond his conclusory postulation.  In particular, Mr. Colwell testified as follows:

> Q.    And again your issue is that Omega Flex is requiring something that is in excess of the code?
>
> A.    Yes.
>
> Q.    Okay … can't they require something in addition to the code?
>
> A.    Yes, they can.  *But to me*, they need to state [] that it's in addition that's in excess of the current codes and not say this is a requirement of the code.
>
> Q.    Okay. And so your issue is with the way they worded it in the D[&]I Guide?
>
> A.    My issue is that they're not stating clearly that is, this exceeds the standards that are published at this point.  Just basically, this exceeds any code requirement and highlighting that they need to make it aware to the people who are doing the bonding that this is needed and it doesn't …
>
> Q.    Right but Omega Flex states that you need it in the D[&]I Guide; is that right? They say that you must include the bonding clamp; is that right?
>
> A.    Yes.
>
> * * *
>
> Q.    Okay,
>
> A.    But all I'm saying is, it is not a requirement of the code.  It exceeds the code. And none of the codes say this has to be done.  *To me,* that's where confusion obviously has come into play …

Exhibit B at pp. 84-86 (emphasis added).  However, in spite of this testimony, Mr. Colwell conceded that product manufacturers are not confined to the requirements within the National

Electrical Code, and can have additional requirements in excess or outside of the code.  Exhibit B at pp. 84-85.  See also Exhibit B at pp. 72-73 (noting within the NEC or NFPA 54 that says Omega Flex (or another manufacturer) cannot require direct bonding or more than the code requires).  Again, a witness cannot qualify as an expert if the subject lies outside the witness's area of expertise or specialized knowledge.  See 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000); Redman, 111 F.3d at 1179; Barrett, 95 F.3d at 382.

> 3. *Mr. Colwell's opinion regarding Omega Flex's instructions cannot be construed as relevant or an opinion that will assist the trier of fact.*

Even assuming *arguendo* that Mr. Colwell's opinion regarding Omega Flex's instructions within the D&I Guide was reliable, it cannot be construed as relevant, as there is no evidence that the installer of the CSST at issue even read Omega Flex's instructions.

In addition to requiring an expert's opinion be reliable and relevant, Rule 702 and Daubert (and its progeny), require that the opinion assist the trier of fact.  In re Pool Prods., 166 F. Supp. 3d at 662; see also Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (noting "fundamentally unsupported opinions offer[] no expert assistance to the jury" and should be excluded); Boulle, 2015 U.S. Dist. LEXIS 182435 at *4 (when deciding whether to admit expert testimony, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").   In terms of relevance, the key question is whether the reasoning or methodology "fits" the facts of the case *and will thereby assist the trier of fact* to understand the evidence.  In re Pool Prods., 166 F. Supp. 3d at 662 citing Daubert, 509 U.S. at 591 (emphasis added).   "[F]undamentally unsupported opinions "offer[] no expert assistance to the jury" and should be excluded.  Id. citing Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005).

Mr. Colwell's opinion ignores not only the D&I Guide in general, as well as the need to use the guide in connection with CSST installation, but also that Omega Flex (like many other

manufacturers) requires that installers be certified and receive the necessary training prior to installing their product.[15] Admittedly, apart from his generic and unsupported opinion that this provision is ambiguous as a result of one sentence, Mr. Colwell has no knowledge regarding whether the installer in this case found the instructions to be confusing.  See Exhibit B at pp. 72, 86.  In fact, with respect to this case, Mr. Colwell testified to the following:

> Q.    And so we have no information that the installer here read the instructions; is that correct?
>
> A.    I have not spoken to the installer in this case.  I don't know what he has read and what he hasn't . . .

Exhibit B at p. 72.  In addition, Mr. Colwell testified:

> Q.    But in any event, here the installer didn't read - - or we have no information that [the installer] read the D&I guide.  *So we can't say that he read the D[&]I guide the way that you read it?*
>
> A.    *I don't know what the installer did.*

Exhibit B at p. 86 (emphasis added).  Furthermore, Mr. Colwell testified as follows:

> Q.    And here, have you spoken with the individual that installed the CSST at the Attuso home?
>
> A.    No.  I have not.
>
> Q.    Do you know who it is?
>
> A.    I was told Audubon Plumbing.
>
> Q.    Do you know who [at] Audubon Plumbing installed it?
>
> A.    No, not as I sit here right now.
>
> Q.    Do you have any knowledge as to whether or not anybody at Audubon Plumbing was certified to install Omega Flex CSST?
>
> A.    I have heard they weren't.

---

[15] Although Mr. Colwell is not certified to install Omega Flex CSST, Mr. Colwell is clearly aware that manufacturers often require installers to be certified and trained specifically with their products, as he is a certified installer of another manufacturer's CSST product.  Exhibit B at p. 84.

Q.      Okay.

A.      … I haven't spoken with anybody from Audubon Plumbing.

Exhibit B at pp. 69-70.

This opinion and related testimony cannot be considered relevant or an opinion that would assist the trier of fact, as a trier of fact has no need for expert opinions which are based on mere personal beliefs rather than sufficient facts.  Tamraz, 620 F.3d at 675 (noting it is not important at this stage that an expert reached the right conclusion, but rather that the expert reached it via a "sound methodology").  See also In re Pool Prods., 166 F. Supp. 3d at 661 (the "aim is to exclude expert testimony based merely on subjective belief or unsupported speculation"); see also Wells, 601 F.3d at 378 ("Although there are no certainties in science, the expert must present conclusions ground[ed] in the methods and procedures of science"); Leblanc, 396 F. App'x at 97; Knight., 482 F.3d at, 352; Moore, 151 F.3d at 275-76 (explaining the focus is not on the result or conclusion, but on the methodology).  Much like in Gopalratnam, where the battery expert failed to present any scientific methodology, testing or evidentiary support for his opinion that a manufacturing defect caused the fire, here Colwell does not present any analytically sound bases or any methodology for that matter that would render his opinion anything more than mere speculation.  See Gopalratnum v. Hewlett-Packard Co., 2017 US Dist. LEXIS 40386, *33 (E.D. Wis. Mar. 21, 2017).

In conclusion, Mr. Colwell's personal belief or opinion that the D&I Guide, particularly Section 4.10, is ambiguous or unclear is irrelevant as there is no evidence that the installer misread (or even read), reviewed or was confused by the applicable instructions.  See Exhibit B at pp. 69-70.  Further there is no evidence suggesting that the installer in this instance was even certified or qualified to install Omega Flex products.  Thus, this opinion and testimony cannot be considered

relevant or an opinion that would assist the trier of fact, as a trier of fact has no need for expert opinions which are based on mere personal belief rather than sufficient facts.

## V.    <u>CONCLUSION</u>

Wherefore, pursuant to Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702, and the requirements espoused in <u>Daubert v. Merrell Dow Pharms., Inc</u>., 509 U.S. 579 (1993) and its progeny, the Integrity experts should be excluded from testifying regarding the following opinions in their February 14, 2019 report as they are neither qualified nor are their opinions reliable or relevant:

1. The fire at issue would have occurred even if the CSST was bonded;

2. The applicable Omega Flex Design Guide and Installation Instruction ("D&I Guide") is ambiguous or confusing.

Dated: August 30, 2019

Respectfully submitted,
THE DEFENDANT
OMEGA FLEX, INC.

By: _David R. Frohn_____
DAVID R. FROHN, Bar No. 5758
MG+M Law Firm
2201 Lake Street, Suite 106
Lake Charles, LA  70601
Telephone:      (337) 419-1929
Facsimile:      (337) 564-6899

BY:   _/s/ Cullen W. Guilmartin_____
Cullen W. Guilmartin (*Pro Hac Vice*)
Delaney M. Busch (*Pro Hac Vice*)
GORDON & REES LLP
95 Glastonbury Blvd., Ste. 206
Glastonbury, CT 06033
Tel: (860) 494-7513
Fax: (860) 560-0185
Email: cguilmartin@grsm.com

### CERTIFICATE OF SERVICE

I, HEREBY CERTIFY that, on this 30th day of August, 2019, the foregoing Memorandum

was electronically filed with the Clerk of the Court using the *CM/ECF* system.  Notice of this filing

will be sent to all counsel of record by operation of the Court's electronic filing system.

_David R. Frohn_____
**DAVID R. FROHN**

36