# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| MONIQUE ATTUSO, et al.,<br>*Plaintiff*<br>vs.<br>OMEGA FLEX, INC., & AUDUBON<br>PLUMBING, INC.<br>*Defendants.* | :<br>:<br>:<br>:  C.A. No.: 3:18-cv-00157-SDD-<br>:  RLB<br>:<br>:<br>: |

**Plaintiff Republic Fire and Casualty Company's Opposition
to the Motion In Limine submitted by Defendant Omega Flex**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.    STATEMENT OF FACTS .................................................................................1

II.   LEGAL STANDARD FOR EXPERT TESTIMONY........................................6

III.  LEGAL ARGUMENT: THE OPINIONS OF THE INTEGRITY EXPERTS ARE
      BASED ON A RELIABLE METHODOLOGY AND ARE ADMISSIBLE.....................9

      1.    The Fire at the Attuso House would have occurred even if the CSST
             had been directly bonded…………………………………………………9

      2.    The CSST was properly bonded and grounded in accordance with applicable
             codes and industry standards, and the Omega Flex instructions are confusing….14

CONCLUSION AND PRAYER ................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987) ...............................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...........................6,7,8,13,18

*Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 576 (Tex. S.D. 2003)......................7

*Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165-66 (E.D. La. 2011)...........................8

*Katzenmeier v. Blackpowder PRODS.*, 628 F.3d 948, 952 (8th Cir. 2010)....................9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999) ........6,7

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) ...............................6

*Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993) ...............................9

*Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 880 (8th Cir. 1986)...........................14

*Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) ...............................12

*Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999)..................7

*St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 406-07 (5th Cir. 2000) ....7

*Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002), *cert. denied*, 537 U.S. 824, 123 S. Ct. 111, 154 L. Ed. 2d 34 (U.S. 2002)..........................17

*Travelers Prop. & Cas. Corp. v. GE*, 150 F. Supp. 2d 360, 366 (D. Conn. 2001)........................8

*United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).....................9

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987). ...............................9

*Weisgram v. Marley Co.,* 169 F.3d 514, 523 (8th Cir.1999), aff'd, 528 U.S. 440 (2000)...............6

*West Plains, L.L.C. v. Retzlaff Grain Co.,* 870 F.3d 774, 789 (8th Cir. 2017) ...............................9

**Rules**

FED. R. EVID. 702 ...............................6,7

**Other Authorities**

David L. Faigman *et al.*, 5 *Modern Scientific Evidence* § 37:9 (2015-2016 ed.) ...........................8

NFPA Fire Protection Handbook, Ch. 921 ..........................................................................9,10,15

NFPA Fire Protection Handbook, Ch. 70 ...................................................................................15

Republic Fire and Casualty ("Republic") as Subrogee of Dr. Monique Attuso ("Attuso"), respectfully submits this Response in opposition to Defendant Omega Flex, Inc.'s Motion to Exclude Certain Opinions and Testimony of Integrity Forensics and Engineering, LLC ("Integrity") and expert Charles Keller Colwell. ("Motion"). The opinions which Defendant seeks to exclude in the Motion are based upon sufficient facts and are the product of reliable principles, testing and methods. Further, the experts reliably applied these principles and methods to the facts of this case in reaching the opinions Defendant now seeks to exclude. These opinions are relevant and will be helpful to the jury. Consequently, the Motion must be denied.

## I.      STATEMENT OF FACTS

This action arises out of a fire which occurred at the residence owned by Monique Attuso, located at 10437 Bank Street Extension, Clinton, Louisiana. On January 21, 2017, a fire occurred destroying the residence and its contents. The fire was caused by a defective flexible gas piping system installed at the home. The (flexible) corrugated stainless steel tubing ("CSST") was manufactured by Defendant Omega Flex.



During a storm, in the early morning hours of January 21, 2017, the Attuso family heard a "huge" lightning strike. They lost electrical power and saw sparks appear to fall from the roof as they looked through the kitchen window. **Exhibit 1 -** Rodriguez deposition, pp. 20:12-24, 17:18-18:15 and 19:19-23. They found a small fire underneath the kitchen sink that was easily

extinguished with water. *Id.,* pp. 22:11-23:13. Mr. Rodriguez, a resident of the Attuso home searched the rest of the house, including closets and attic areas, and found no other evidence of fire. *Id.,* pp. 23:16- 24:17.  Later, smoke was seen, and the house was on fire. *Id.,* pp. 25:4-20.

Christian Mulkey, fire investigator with M.A. Stringer and Associates, investigated the fire loss that occurred on January 21, 2017. Mulkey determined that the fire originated in the interstitial space in the area over the kitchen range, which is the void space between the ceiling of the kitchen and the floor of the upstairs bonus room and bedroom. See, **Exhibit 2** – Mulkey Report; **Exhibit 3 -** Mulkey Deposition, pp. 61:23-62:9; 72:2-15 and 146:2-147:13.

Charles Keller Colwell ("Colwell") with Integrity investigated this fire with Mulkey. His affidavit and the Integrity Report are attached as **Exhibit 4**. As stated in the Affidavit, Integrity's investigation supported the following conclusions:

- At approximately 2:57 a.m. on January 21, 2017, lightning struck the Attuso home generating one arc hole in a section of 3/4" OmegaFlex TracPipe® corrugated stainless steel tubing (CSST). This section was routed within the interstitial space between the ceiling of the kitchen and the floor of an upstairs bonus room. This arc hole was located within the area where witnesses first noticed the fire. It is also within the area of origin as identified by Mr. Mulkey.  **Exhibit 5 -** Colwell Deposition, pp. 25:10-26:18.



- The fire in the Attuso home occurred when a lightning-induced arc hole was created in the CSST gas piping system. The propane fuel gas within the OmegaFlex TracPipe® CSST piping escaped and was ignited during the arc event. This resulted in a fuel-gas-fed fire. **Ex. 4,** ¶ 12; **Ex. 5**, pp. 124:22-125:20.

- The arc event causing the hole occurred between the TracPipe® CSST and a nearby metallic vent duct for the kitchen range's venthood system. This venthood unit was grounded via its electrical branch circuit. **Ex. 4,** ¶ 13**; Ex. 5**, pp. 27:6-9.

- The identified arc hole is roughly elliptical in shape, about 1.10 by 1.95 mm in overall extent. The area of the hole is approximately 1.52 square millimeters. Our estimate of charge transfer, based on the Hagenguth equation and assuming the measured 0.012 inches CSST wall thickness, is approximately 0.60 coulombs (a measure of electrical charge transfer). **Ex. 4,** ¶ 14.

- The calculated 0.60 coulombs (**Ex. 4,** ¶ 14; **Ex. 5**, pp. 33:17-21) responsible for causing the hole in the yellow jacketed OmegaFlex TracPipe® installed in the Attuso home would not have caused a hole in OmegaFlex's TracPipe® CounterStrike® product. Nor would 0.60 coulombs have been capable of perforating rigid black-iron pipe. **Ex. 4,** ¶ 14; **Ex. 5**, pp. 102:25-103:4.

- Because of the arc hole, the OmegaFlex TracPipe® CSST used to distribute propane gas throughout the Attuso home failed to contain the fuel gas. **Ex. 4,** ¶ 15**.**

- The gas piping system in the Attuso home was bonded to the electrical ground in accordance with the 2005 National Electrical Code via the equipment bonding connections at the gas-fired, tankless water heaters, which also meets the bonding requirement for gas piping as stated in the 2006 National Fuel Gas Code, and 2006

3

International Fuel Gas Code. At the time this home was constructed, these were published and recognized industry standards, though not formally adopted in East Feliciana Parish. **Ex. 4,** ¶ 22.

- The "bonding" as described in Section 4.10 of the OmegaFlex Design and Installation Instructions was not a requirement of the 2005 National Electrical Code, the 2006 National Fuel Gas Code, or the 2006 International Fuel Gas Code. **Ex. 4,** ¶ 23.

- In high voltage testing, Integrity bonded CSST gas piping in the manner depicted and described in Section 4.10 of the OmegaFlex Design and Installation Instructions. Integrity subjected this CSST to electrical impulse currents at voltages below that of a typical lightning strike. **Ex. 5.**, pp. 94:11-23. The physical testing demonstrated that an arc can still occur between the CSST gas piping and another grounded conductive component. The described arc event can result in an arc hole from which the fuel gas can escape from the CSST gas piping. **Ex. 4,** ¶ 28.

- The characteristics of the arc hole observed in the OmegaFlex TracPipe® CSST gas piping recovered from the Attuso home are substantially similar to those created during physical testing in our high-voltage laboratory. **Ex. 4,** ¶ 30.

- The fire in the Attuso home was not the result of a malfunction or failure of the electrical service, any electrical branch circuit, or any electrical appliance. **Ex. 4,** ¶¶ 18, 19.

- Other potential electrical ignition sources within the area of origin as identified by Mr. Mulkey were considered. All other potential electrical ignition sources, except the lightning-induced arc hole in the OmegaFlex TracPipe® CSST gas piping, can be eliminated as a probable electrical cause of this fire. **Ex. 4,** ¶ 18.

- Physical testing in Integrity's high voltage laboratory has proven that leaking fuel gas from an arc hole in CSST can, and frequently will, be ignited resulting in a sustained flame. This ignition occurs during the arc event. The arc event consists of the electrical discharge, the melted stainless steel, and the burning yellow jacket. **Ex. 4,** ¶ 21.

Elizabeth C. Buc, PhD, PE, Materials Engineer, investigated this fire. Her report is attached as **Exhibit 6,** and Dr. Buc's Deposition is attached as **Exhibit 7.** She concluded as follows:

1)     The cause and the likely ignition source of the Attuso fire was the lightning induced penetration and melting of the thin wall corrugated stainless steel tubing above the kitchen ceiling. The Tracpipe CSST arced to the nearby sheet steel vent. The temperature of the molten stainless steel is sufficient to ignite the escaping gas. **Ex. 7,** p.9:9-14**.**

2)     Omega Flex Tracpipe CSST is unreasonably dangerous and defective as designed due to the thin wall construction making it more susceptible to catastrophic damage from direct and indirect lightning strike releasing gas into structures increasing the risk of fire. **Ex. 6**.

The Attuso's home was completed in 2008. Neither prior to nor after the fire, did Attuso ever receive any warnings or communications, written or otherwise, from Omega Flex, Inc. or anyone else regarding the installation of CSST in her home or the risks associated with its use including fires due to lightning strikes.  **Exhibit 8** – Attuso Affidavit.

Based upon numerous investigations, lawsuits and admissions by Omega Flex, CSST will fail catastrophically from the high voltage discharge of electricity produced by a direct lightning strike to a home due to its thin-walled construction and dielectric outer jacket. Omega Flex alleges that Plaintiff's experts, Integrity, should be excluded regarding their opinions and testing proving that the fire would still occur despite bonding according to the December 2005 TracPipe

Flexible Gas Piping Design Guide & Installation Instructions ("D&I Guide"), that the requirements in the guide are not required by the National Electric Code, and they are confusing and inadequate. Omega Flex's Motion should be denied because the CSST can and does fail even when properly bonded, based upon sound scientific principles and testing by Integrity. Moreover, the CSST was properly bonded and grounded in accordance with the applicable codes and industry standards; yet it still failed and caused the fire that destroyed the Attuso home.

## II.    LEGAL STANDARD FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Expert testimony is admissible if (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir.1999), aff'd, 528 U.S. 440 (2000). In *Daubert*, the Supreme Court provided the analytical framework for determining whether expert testimony is admissible under Rule 702. Rule 702 charges trial courts to act as "gate-keepers," making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93. The Supreme Court offered an illustrative, but not an exhaustive, list of factors that district courts may use in evaluating the reliability of expert testimony. These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. *Id.* at 593-94; *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999), the Supreme Court emphasized that the *Daubert* analysis is a "flexible" one, and that "the factors identified may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150. The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. In *Kumho Tire*, the Court explained that an expert might draw a conclusion from a set of observations based on extensive and specialized experience. *Id.* at 156.

Accordingly, this circuit has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). (holding that the district court properly admitted testimony of a psychiatrist who diagnosed plaintiff because the psychiatrist "testified to his experience, to the criteria by which he diagnosed [the plaintiff], and to the standard methods of diagnosis in his field"); *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 406-07 (5th Cir. 2000) (holding that ecologist's first-hand observation of flooded marsh at issue combined with his expertise in marshland ecology were sufficiently reliable bases of his opinion on causation under Daubert to admit the testimony). A single test might constitute "sufficient facts or data" under Rule 702 where repeated tests are unavailable or impracticable because of prohibitive expense or other reasons. *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 576 (Tex. S.D. 2003).

In determining whether an expert's methodology is sufficiently reliable, the Court analyzes whether the expert's methodology can be controlled by standards, and whether the theory or methodology is generally accepted within the scientific community. 509 U.S. at 594. Courts largely agree that the peer-reviewed NFPA 921 embodies the standards of the field of fire investigation and causation. David L. Faigman *et al.*, 5 *Modern Scientific Evidence* § 37:9 (2015-2016 ed.); *see also Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165-66 (E.D. La. 2011); *Travelers Prop. & Cas. Corp. v. GE,* 150 F. Supp. 2d 360, 366 (D. Conn. 2001) (noting that NFPA 921 is "a peer reviewed and generally accepted standard in the fire investigation community"). The NFPA 921 explains that in order to apply the Scientific Method to fire investigation, the investigator must follow seven steps: (1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) select a final hypothesis. A hypothesis can be tested "physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research . . ." *Id.* According to NFPA 921, for a fire to start from an electrical source, the electrical wiring, equipment, or component must have been energized, and this energy must produce sufficient heat and temperature to ignite nearby combustible material. *Id.* at 107.  NFPA 921 states that if a fire is caused by electricity, the source of heat, the temperature generated, the first ignited fuel, and the path of transfer from the heat source and the ignited fuel must be calculated or identified. *Id.*

The Court in *Daubert* noted that its role as a gatekeeper does not replace the traditional adversary system or the jury. See *Daubert* , 509 U.S. at 596. As the Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*.

(citing ). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co*., 826 F.2d 420, 422 (5th Cir. 1987). *See, e.g.*, *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993) ("It ordinarily is the province of the jury to gauge the expert witness[']s credibility and the reliability of his data."). "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *West Plains, L.L.C. v. Retzlaff Grain Co.,* 870 F.3d 774, 789 (8th Cir. 2017) (quoting *Katzenmeier v. Blackpowder PRODS.,* 628 F.3d 948, 952 (8th Cir. 2010).

### III.    LEGAL ARGUMENT: THE OPINIONS OF THE INTEGRITY EXPERTS ARE BASED ON RELIABLE METHODOLOGY AND ARE ADMISSIBLE.

**1.    The Fire at the Attuso House would have occurred even if the CSST had been directly bonded.**

As noted in the Motion, Defendant contends that the Integrity Experts should be prohibited from rendering the challenged opinions because they are unsupported by reliable methodology, and that expert Colwell is not qualified to render an opinion on applicable standards regarding bonding and the confusion created by the Omega Flex instructions. This contention is without merit.[1] During their investigation of the fire, the Integrity Experts followed the reliable and widely accepted principles and methods described in NFPA 921 **(Exhibit 4, Colwell Affidavit Paragraph 34).** Specifically, in developing all of their opinions, including all of the opinions

---

[1] Omega Flex has previously filed a motion and challenged the qualifications and the methodology and testing of the Integrity experts in State Farm Fire and Casualty v. Omega Flex, United States District Court Eastern District of Arkansas, civil action 4:16-cv-00387-JLH. The Motion was denied.

challenged by Defendant in the Motion, the Integrity Experts applied the scientific method described in NFPA 921. The challenged opinions of the Integrity Experts are based on the data collected, the data analyzed, the developing and testing of hypotheses using inductive and deductive reasoning, physical testing, and the experience and observations of the Integrity Experts. **(Exhibit 4,** Colwell Affidavit and Integrity Report**) (Exhibit 13,** Affidavit of Derek Geer, ¶27).

There is no dispute that the Attuso home suffered a direct lightning strike. Republic has disclosed and presented for deposition five experts in this matter to opine as to the area of origin and cause of the fire at the Attuso residence. Through their investigation, Plaintiff's experts determined that the cause and the likely ignition source of the Attuso fire was the lightning induced penetration and melting of the thin wall corrugated stainless steel tubing above the kitchen ceiling. **Exhibit 3 -** Mulkey Deposition, pp. 150:10-151:14. The Tracpipe CSST arced to the nearby HVAC vent. The temperature of the molten stainless steel was sufficient to ignite the escaping gas. *Id.,* pp. 145:25-146:21. There were no electrical or other type of potential ignition source found within the identified area of fire origin during the removal of the debris and processing of the fire scene. **Exhibit 2 -** Mulkey Report; **Exhibit 3 -** Mulkey Deposition**,** pp. 62:14-63:9; 154:11-15 and 158:7-23.

The parties agree that an electrical arcing event formed the melting hole found post-fire in the TracPipe CSST supply line at the Attuso residence. According to Defendant's expert, Harri Kytomaa, "[o]ne hole was found in the TracPipe CSST supply line near the branch to the kitchen stovetop. The hole was formed from electrical arcing between the CSST and the metal vent pipe for the stovetop exhaust hood. The source of the electrical energy was lightning." **Exhibit 9 -** Exponent Kytomaa Report, at ¶6. The parties disagree as to whether the hole in the CSST caused

the fire.

In the Motion, the Defendants challenge the testing of Integrity relating to the susceptibility of bonded CSST arguing that by pinpricking the CSST and the opposing cable, Integrity created a pathway that encouraged an arcing event which did not exist at the Attuso home. In high voltage testing, Integrity bonded/grounded CSST gas piping in the manner depicted and described in Section 4.10 of the OmegaFlex (DEI Guide).  They subjected this CSST to electrical impulse currents at voltages well below that of a typical lightning strike. The physical testing demonstrated that an arc can still occur between the CSST gas piping and another grounded conductive component. The described arc event resulted in an arc hole that would allow fuel gas to escape the CSST gas piping. (**Exhibit 4**, Colwell Affidavit, Paragraph 28). Laboratory testing of CSST piping has traditionally utilized a pinprick to breach the piping's insulative outer jacket to compensate for using test voltages lower than the voltage present in a lightning strike. In prior testing performed in 2003 by OmegaFlex, Inc. at Lightning Technologies, Inc. (Report #LT-03-2161 - Dated 9 July 2003 - Revised 5 September 2003), the following statement is made in the Abstract section of this report:

> "The simulated lightning testing included preparing the sample by breaching the jacket only. Based on the field **failures reviewed by OmegaFlex, the jacket can easily and is usually breached during installation;** although for the testing, the breach was required to assist in the discharge. The sample preparation included pinprick puncturing the conventional jacket on the test sample at the discharge location. The **TracPipe** and Gastite standard nonconductive jacket material could sustain a maximum 0.12 coulomb discharge without a puncture of the stainless steel tubing."

(**Exhibit 4**, Colwell Affidavit, Paragraph 29).

The Integrity testing produced for the Attuso investigation is real world testing that is substantially similar to the known facts gathered from first-hand knowledge of the installation at the Attuso home. The bonding test procedure was also developed based on Mr. Colwell's

extensive experience in investigating CSST-related fires over the past 14 years. The physical testing was specifically designed to incorporate a wide range of variables observed during field investigations through the years. (**Exhibit 4**, Colwell Affidavit, Paragraph 30). The testing performed by Integrity demonstrates that bonding TracPipe CSST in accordance with the D&I Guide does not always prevent electrical arcing from creating a perforation in the CSST. In testing, Integrity found that not only would arcing occur between the bonded CSST and the crossing over equipment ground conductor, but the arc event was also capable of producing perforations in the gas piping. These perforations occurred at numerous distances along the length of gas piping, with the nearest being as close as ten feet from the bonding clamp connection. The characteristics of the holes created in the testing are consistent with hole in the Attuso CSST, as well as holes in the many other CCST-related fire losses Integrity has investigated. (**Exhibit 10**, Spruiell Affidavit, Paragraphs 8, 9).

It is surprising that Defendant would contend that these factors make the Integrity Experts' testing unreliable, as testing relied on by Defendant's had the similar limitations. Specifically, Defendant's expert, Kytomaa, testified in another case to having pinpricked the jacket on CSST that was the subject of his testing. (**Exhibit 14,** Kytomaa Dep. 150:2-5; 165:18-167:5)**.** As Dr. Kytomaa explained, the jacket on the CSST is pinpricked to provide a localized decrease in the dielectric strength of the jacket so that testing on CSST can be conducted at lower voltages than would be generated by a lightning strike. (**Exhibit 14,** Kytomaa Dep. 166:3-22)**.** As stated by the Eighth Circuit Court of Appeals, "[w]hen a litigant clearly believes a certain methodology is acceptable as shown by his or her own expert's reliance on that methodology, it is disingenuous to challenge an opponent's use of that methodology." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007).  Even OmegaFlex's own representatives state that it is "usually breached during

installation." (see Attachment K - LTI Report #LT-03-2161). Utilization of the pinprick has been, and still is, an acceptable test procedure based on OmegaFlex's own findings. In fact, by attachment of the representative "direct bond" wire to the CSST system, Integrity physically tested the theory stated in the Kytomma Affidavit paragraph 7, that the "goal of direct bonding of CSST is to prevent an electrical arcing event from melting a hole in the CSST." Integrity testing on "direct bonded" CSST, performed at numerous locations on the CSST and with varying opposing conductor lengths/resistances, indeed proves that the Omega Flex's goals were not accomplished, and its claims regarding bonding are false. (**Exhibit 4**, Colwell Affidavit, paragraph 32). This opinion is also mirrored in a position statement issued by the International Association of Fire Chiefs. IAFC states that efforts to reduce the likelihood of leaks by introducing bonding requirements in 2009 have not significantly reduced the occurrence of fires. (**Exhibit 4**, Colwell Affidavit, paragraph 33).

As demonstrated above, the Integrity Experts were able to employ a reliable and scientifically accepted methodology to reach their opinions. The trial court's role is not to determine whether an expert's opinion is correct, and the appropriate means of attacking the conclusion of an expert is through cross-examination and presentation of the evidence, not through a motion to exclude. *See Daubert*, 509 U.S. at 596. Defendant alleges that the Integrity testing is inadmissible because the test conditions do not mirror the conditions that were present at the Attuso home on the day of the fire. The standard does not require a laboratory test that exactly replicates real life conditions, which involves lightning impacting a home and a fire caused by the ignition of fugitive gases. Expert opinions based on evidence gathered through testing is admissible even though the test conditions do not replicate the actual conditions. "Admissibility . . . does not depend on perfect identity between actual and experimental

conditions. Ordinarily, dissimilarities affect the weight of the evidence, not its admissibility." *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 880 (8th Cir. 1986); *see also Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987) (holding that the trial court did not abuse its discretion in admitting evidence where there were "[s]ome similarities in conditions [that] existed between the experiment and the accident, but the conditions were *far from identical*") (emphasis added). Further, testing does not need to be performed in circumstances similar to the actual conditions at issue in order to be admissible when the testing does not purport to be a recreation of the actual conditions and is used to demonstrate general scientific principles that are being applied by an expert. *Champeau*, 814 F.2d at 1278.

## 2. The CSST was properly bonded and grounded in accordance with applicable codes and industry standards, and the Omega Flex instructions are confusing.

In its Motion, Defendant moves to exclude certain opinions and testimony of Mr. Colwell claiming that he is not qualified to render the opinions concerning bonding of the CSST and that the Omega Flex instructions are confusing. As a defense to Plaintiff's claims, Omega Flex has asserted that this loss would not have occurred had the contractor(s) responsible for the installation of the CSST in the Attuso residence bonded and grounded the CSST in compliance with the December 2005 or January 2005 D&I Guide. Defendant bases this contention, in part, on the opinions of its expert, Kytomaa. Kytomaa was recently excluded from offering testimony regarding bonding and the failure of the installer to bond according to the manufacturer's guide in a Florida case (See **Exhibit 15,** Order).

With respect to Mr. Colwell's qualifications, he is a licensed master electrician and a practicing electrical contractor in Texas, successfully passed the Journeyman Electrician exam in August 1999, and the Master Electrician exam in June 2002 in which the primary subject for electrician testing is to demonstrate competency in interpretation and application of the National

Electrical Code (NFPA 70). (**Exhibit 4**, Colwell Affidavit, paragraph 2). Since 2001, he has been working as an Industry Expert as defined in Section 15.5 of NFPA 921: Guide for Fire and Explosion Investigations (2017), and provided technical assistance to fire investigators, which often requires knowledge of the National Electrical Code, among other construction standards, as well as interpretation of those codes and standards. (*Id.* at paragraph 3). In February 2009, he became a "Qualified Gastite Installer". Gastite is a type of CSST product, very similar to the TracPipe CSST product manufactured by OmegaFlex which was installed in the Attuso home. (*Id.* at paragraph 5). From 2005 to present, he has investigated over 200 fires involving CSST. All of these fires involving CSST have key similarities to the fire that occurred at the Attuso home. They all occurred after a lightning strike to the structure, or nearby. They all resulted in at least one lightning-induced arc hole in the thin wall of the CSST gas piping. This arc hole allowed the fuel gas to escape, which was ignited, resulting in a fuel gas-fed fire. (*Id.* at paragraph 6). At Integrity, Colwell has been directly involved with many physical tests of CSST gas piping, and directly involved in lightning testing performed at NTS in Pittsfield, Massachusetts (formerly Lightning Technologies, Inc). He has presented at fire investigation seminars and annual conferences in Louisiana, Arkansas, Oklahoma, and Texas. In 2018, he presented on the topic of CSST at the National Association of State Fire Marshals conference and has presented twice on CSST gas piping systems for the Texas Professional Real Estate Inspectors Association. He participated in writing two published papers on the topic of CSST failures from lightning and roofing fasteners. (*Id.* at paragraph 7). (See attachment C, Colwell CV, Exhibit 4). Clearly, Colwell is more than qualified to render opinions regarding the installation of the CSST and governing codes. As a practicing electrician, he is also qualified to render opinions regarding the confusion created by the Omega Flex instructions as compared to the code and industry requirements when a CSST is installed.

Mr. Colwell has concluded that the grounding/bonding of the gas system in the Attuso residence, per the NEC, was properly accomplished by the grounding through the two water heaters. **Exhibit 4** - Colwell Affidavit at Ex. 4, ¶ 20. The instructions in the Omega Flex D&I Guide regarding the use of a bonding clamp and so called "direct bonding" is confusing and can be read in two ways. One way to interpret the D&I Guide is to read it to mean that the use of the direct bonding scheme must be followed. A second way to interpret the D&I Guide it to read it to mean that the requirements of the NEC must be met, and that the use of direct bonding is just one way of achieving bonding per the NEC, and that if this method is chosen the clamp should not be attached to the corrugated services. Colwell's understanding is the latter, and that compliance with the NEC is what is required. *Id*. at ¶ 22-25. Further, in describing the confusion created by the language of the Omega Flex D&I Guide, Mr. Colwell points out that the NEC doesn't require direct bonding. *Id*. at ¶ 25. The D&I Guide gives deference to the NEC, and then the NEC Code describes how to bond.  The confusion created by Omega Flex is that the installer can do the so-called direct bond or he can bond per the NEC, and either one is acceptable. *Id*. at ¶¶ 25-28.

As an electrician, who would install the CSST, Mr. Colwell's understanding that Figure 4-21 of the D&I Guide, which illustrates a method of bonding CSST, was trying to show what Omega Flex thought were the requirements of the National Electric Code. *Id*.  Mr. Colwell believes that by including Figure 4-21 in the D&I Guide, Omega Flex was trying to suggest bonding is an acceptable means of protecting against lightning, which, per the National Electric Code, it is not. *Id*.  Mr. Colwell is critical of the manner in which Omega Flex has attempted to instruct installers as to the proper methodology for bonding its CSST. *Id*.   Considering his training, education and experience as an electrician, and having personally installed bonding and grounding systems on numerous buildings and systems, if Mr. Colwell is confused by the

instructions related to bonding and grounding in the Omega Flex D&I Guide, it is likely that the same instructions will be confusing to an electrical contractor attempting to follow those same instructions. The trier of fact can consider the testimony of an expert regarding his own understanding and perception of instructions. This testimony does not constitute an expert assessment, and it is related to matters within the scope of his personal knowledge. *See Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002), *cert. denied*, 537 U.S. 824, 123 S. Ct. 111, 154 L. Ed. 2d 34 (U.S. 2002).

Prior to 2007, Omega Flex had not performed any testing to validate bonding and grounding as an effective means of protecting TracPipe yellow jacketed CSST from damage due to lightning. In fact, the Director of Codes and Standards for Omega Flex, has admitted that the addition of a six-gauge bonding and grounding conductor, independent bonding clamp, to Omega Flex TracPipe CSST will not eliminate all dangers from lightning. **Exhibit 11** - Torbin Deposition**,** pp. 95:1-7. Ultimately, Mr. Torbin admitted that bonding and grounding is not always an effective means of protecting yellow jacketed CSST from lighting, as it does not prevent all lightning house fires. *Id.,* pp. 96:25-97:7. Specifically, with regard to the December 2005 D&I Guide that was applicable to the installation of the CSST in the Attuso residence, Mr. Torbin testified that the D&I Guide does not provide any warnings with regard to the fact that CSST can be bonded and grounded and still have arc damage due to lightning and proximity to other metallic systems. *Id.,* pp. 82:18-83:9.

In fact, testing conducted by Integrity has concluded that bonding and grounding is not an effective means of protecting TracPipe CSST from lightning induced damage. **Exhibit 12** - Spruiell Affidavit. The results of the testing performed by Integrity demonstrates that bonding TracPipe CSST in accordance with the D&I Guide does not always prevent electrical arcing

from creating a perforation in the CSST. **Exhibit 13,** Geer Affidavit, ¶25-26.  Through the Integrity testing they found that not only would arcing occur between the bonded CSST and the crossing over equipment ground conductor, but the arc event was also capable of producing perforations in the gas piping. These perforations occurred at numerous distances along the length of gas piping, with the nearest being as close as ten feet from the bonding clamp connection. The characteristics of the holes created in the testing are consistent with hole in the Attuso home, as well as holes in the many other CCST-related fire losses Integrity has investigated.  **Exhibit 12**, ¶¶ 8-9. It is clearly a question of fact whether bonding and grounding is an effective means of protecting CSST from damage due to lightning, and whether bonding would have made a difference in this case. The experts of the parties disagree. A disagreement among experts is not grounds for excluding an expert.

## CONCLUSION AND PRAYER

Defendant seeks to have the aforementioned opinions of the Integrity Experts excluded because, according to Defendant, the opinions are not reliable. Whether an expert's opinion is sufficiently reliable to be admissible is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. *Daubert*, 509 U.S. at 594-95. As demonstrated above and the evidence attached hereto, the opinions of the Integrity Experts are based on scientifically and widely accepted methodologies. Consequently, such opinions are reliable and admissible. Further, there can be no doubt that the opinions of the Integrity Experts will greatly assist the jury in understanding the complex issues that are in dispute in this matter. Accordingly, there is no basis for striking any of the Integrity Experts' opinions, and the relief requested in the Motion must be denied.

Respectfully Submitted By:
**Hannah, Colvin & Pipes, LLP**
10626 Timberlake Drive
Baton Rouge, LA 70810
Telephone (225) 766-8240
Facsimile (225) 766-5546
Email: wrpipes@hcpllp.com
          baydell@hcpllp.com

_____*/s/ W. Ransom Pipes*_____
W. Ransom Pipes (Bar No. 17748)
Blaine T. Aydell (Bar No. 34430)

## CERTIFICATE OF SERVICE

I hereby certify that I have this date forwarded a copy of the above and foregoing pleading to all counsel of record by depositing same in the U.S. Mail, postage-prepaid, and properly addressed on this 15th day of October, 2019.

_____*/s/ W. Ransom Pipes*_____
W. Ransom Pipes